COLORADO–WYOMING EXPRESS et al. v. DENVER LOCAL UNION NO. 13 OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, STABLE MEN AND HELPERS OF AMERICA et al.

No. 200.

District Court, D. Colorado.

Oct. 7, 1940.

Harry S. Silverstein and Harry S. Silverstein, Jr., both of Denver, Colo., for plaintiffs.

Philip Hornbein and Theodore Epstein, both of Denver, Colo., for defendants.

**156**

SYMES, District Judge.

This bill alleges that the plaintiffs, all foreign corporations, are individual motor vehicle common carriers transporting commodities by truck in interstate commerce under separate certificates of authority and permits duly issued by the Interstate Commerce Commission and the respective states, through which they transport interstate commerce, "interlining" with each other. That the defendant, the International Brotherhood of Teamsters, etc., Denver Local No. 13, is a labor union affiliated with, and chartered by, the International Brotherhood of Teamsters, Chauffeurs, Stable Men and Helpers of America, with headquarters at Indianapolis, Indiana—an affiliate of the American Federation of Labor. The defendant Keigley is business agent of Local Union No. 13, and Woxberg is an international or state organizer for the defendant, International Brotherhood. The defendant, Motor Carriers' Association, is a nonprofit corporation organized under the laws of Colorado, to which all the plaintiffs and numerous other truck operators—that is to say, motor vehicle common carriers—belong.

It is then alleged that on April 12, 1938, defendant Association executed a certain contract in writing with the local, then known as Local Union No. 444 of said International Brotherhood, and with other local unions in Wyoming, New Mexico and Montana, all of which are, and were, affiliated with the International Brotherhood in the American Federation of Labor. Said contract is attached to the bill marked Exhibit A, and was, it is alleged, for the benefit of the plaintiffs and each of them and other members of the Association. The plaintiffs are parties to said contract.

The bill then pleads the terms and legal effect of said agreement (Exhibit A), alleging it was agreed neither party would interfere with, restrain or coerce employees by discrimination in regard to hire or tenure of employment. It recites that truck operators are subject wholly to government regulatory agencies that emphasize the maintenance of uninterrupted and regular service to the public, and it was agreed the union and all other union organizations party to the contract would do everything within their power to prevent sympathetic strikes and prevent stoppage of work as the result of any controversy between the parties. That there would be no interference in the normal business of the truck operators' association, including the business of the plaintiffs, regardless of the non-union or union affiliation of any person, firm or corporation with whom the plaintiffs, or other members of the said association, may do business. That the control of cargo transported by members of the Association, including the plaintiffs, to destination must be preserved and protected, so that the handling of the same shall be at all times performed by the employees of members of the Association, including the plaintiffs, or by employees of those to whom, or for whom, such cargo might be transported. That any differences or controversies relative to the application or interpretation of the agreement, as well as matters of mutual concern not covered thereby, should be arbitrated by a board therein provided for.

It is then alleged the plaintiffs, and other truck operators, including several named operating under certificates of authority from the Interstate Commerce Commission, under the Motor Carrier Act of 1935, 49 U.S.C.A. §§ 301–327, have maintained joint through rates and tariffs to and from points located respectively on the lines of the several plaintiffs and points on the lines of other motor carriers, and operators named. That the joint rates have been duly approved by the Interstate Commerce Commission, and by the terms thereof the plaintiffs, and other carriers, are in law bound to receive from each other all freight tendered to them at Denver and common points, freight consigned or destined to points on their respective lines and those of connecting carriers, and the said other carriers are likewise bound to deliver to the plaintiff at Denver, or other common points, freight originating on their lines, or beyond their lines, and handled by them and destined to points on the lines of the respective plaintiffs. Binding contracts to that effect exist between the parties to thus accept and deliver freight originating on the respective lines of the different plaintiffs and their connecting carriers. That this is generally known and referred to as "interlining" business with each other.

That the plaintiffs, in order to carry out their business as aforesaid, have established freight terminals, depots and other facilities to render the service authorized under the authority of the regulatory bodies and have procured trucks and vehicles and the necessary equipment in order to serve the public as interstate carriers by motor vehicle, and have established and en-

joy a reputation for efficient and dependable service, and thus built up a profitable business as a result thereof.

It is next alleged that prior to the unlawful acts complained of plaintiffs had transported a large volume of freight, especially "interlining" business, with other carriers and the success and value of their business is dependent on the continued regular and dependable service, on frequent and regular schedules, free from interference on the part of the union and the individual defendants, Keigley and Woxberg.

The bill then alleges (paragraph 13) that the said local union has engaged in a campaign to force all truck operators to sign closed shop contracts, which would compel them to employ only men belonging to AF of L unions and discharge all employees who are not members thereof. That there are already in force in the industry many closed shop contracts in the territory between the Mississippi River and the Pacific Coast, and the unions are thereby in a position to dominate and control all such workers and coerce the motor carriers who sign such contracts, and all other employers of labor engaged in the manufacturing, processing, dealing and merchandising of commodities shipped in interstate commerce, and that said union employers are fearful of sympathetic strikes and sundry annoyances and disturbances to their respective businesses if they fail to do so.

That the local unions demanded each of the plaintiffs enter into a closed shop contract with the union; that the plaintiffs have refused, alleging such action would violate the contract (Exhibit A), and is prohibited by its terms. That the union notified the plaintiffs the contract has no force and effect and they refuse to be bound thereby, and have threatened the plaintiffs unless they do sign a closed shop contract the union would prohibit any AF ofL union workers to handle freight for the plaintiffs, and would prevent other motor carriers from "interlining" business with the plaintiffs, and prevent customers of the plaintiffs who might have AFofL contracts, from using the transportation services of the plaintiffs.

Further, in furtherance of said objects, the local union has warned other motor carriers not to "interline" with the plaintiffs, or accept or receive from the plaintiffs any freight for transportation by the plaintiffs, and has given similar notice to many of plaintiffs' customers under threat of strike. That such other motor carriers, through fear of consequences and resulting loss, damage and injury, have complied with the union warning and refused to, and continue to refuse to, "interline" any business with the plaintiffs, or deliver or receive from plaintiffs any freight for transportation—all without any complaint in any way, or with any conduct or want of conduct on the part of the plaintiffs concerning their services.

It is then alleged such acts and conduct on the part of the union are prohibited by the contract (Exhibit A), and such conduct on the part of the union is acts and conduct that foment and produce strikes and interfere with the plaintiffs' regular and normal business. That as a result thereof the plaintiffs' business has appreciably diminished to the extent of hundreds of dollars per day as to each of the plaintiffs, and in addition renders the plaintiffs unable to carry out the joint through rates, routings and tariffs, and puts them in immediate danger of having their certificates of authority referred to cancelled and subject to incurring penalties for failure to operate and perform services in accordance with law, and has, and will, cause great, immediate, substantial and irreparable loss to plaintiffs and their property rights. That the acts and conduct of the defendants, not only violate the contract (Exhibit A), but constitute an unreasonable restraint of trade and commerce between the states.

That plaintiffs, and each of them, have fully complied with all covenants and agreements on their part to be done and performed, have no plain, speedy and adequate remedy at law in the premises, and unless said acts of the defendants are restrained and the said defendants compelled to perform the terms and conditions of the contract (Exhibit A), plaintiffs will be deprived of their property without due process of law, and their business utterly ruined.

Furthermore, that the public officers charged with the duty of protecting plaintiffs' property and property rights have no authority to furnish any protection to plaintiffs or their property, and that defendants have refused to negotiate or discuss any matters in controversy between them, or submit the same to arbitration.

The plaintiffs then pray that contract (Exhibit A), be declared in full force and effect on the union and all its members, and for injunctive relief.

The defendants' motion to dismiss alleges the bill fails to state a claim upon which relief can be granted. That there is no contractual agreement between the plaintiffs, or either of them, or the defendants, for the reason the contract (Exhibit A) is without effect or validity until the parties enter into an agreement covering schedules or rates of pay and other working conditions, and that the court lacks jurisdiction under 29 U.S.C.A. § 104 (the Norris-La-Guardia Act).

Boiled down, the gravamen of the bill is that the unions are attempting to enforce closed shop contracts on the motor carriers under threat of calling out on sympathetic strike their members who are employed by other carriers who "interline" business with the plaintiffs in Colorado and elsewhere. It is admitted in the bill that no picketing has been attempted.

29 U.S.C.A. § 101, known as the Norris-LaGuardia Act, prohibits the Federal Court from granting injunctions, either temporary or permanent in cases growing out of labor disputes, except in the manner strictly provided for in the Act, contrary to the public policy declared by § 102 of the Act. This section recites that whereas under prevailing economic conditions owners of property organize under corporate and other forms of ownership association, the individual worker is commonly helpless to exercise his liberty of contract in dealing with such corporations of employers; that in order to protect his freedom of labor, and obtain acceptable terms and conditions of employment, it is necessary he have full freedom to organize and designate representatives of his own choosing to negotiate the terms and conditions of his employment, and further that the workman shall be free from the interference or coercion of employers in selecting his representatives, or in other activities for the purpose of collective bargaining, or mutual aid or protection.

The Act also prescribes certain other limitations on the authority of the courts of the United States. Among them is § 104, prohibiting any court of the United States from issuing an injunction preventing any person or persons interested in a case involving or growing out of any labor dispute, from doing singly or in concert any of the following acts:

"(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

"(b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in section 103 of this chapter; * * *.

"(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence; * * *

"(g) Advising or notifying any person of an intention to do any of the acts heretofore specified;

"(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and

"(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in section 103 of this chapter."

See, also, § 103 and § 105.

Section 107 lays down the only conditions under which a Federal Court may issue injunctions in a labor dispute; that it can only be done after a finding of fact by the court after a full hearing, that unlawful acts have been threatened and will be committed unless restrained; that substantial and irreparable injury to complainant's property will follow; that greater injury will be inflicted on complainant by the denial of relief than will be inflicted on defendants by granting relief; that the complainant has no adequate remedy at law, and that the public officials are unable or unwilling to furnish adequate protection.

The defendants' argument is mainly that the relief asked for violates this section, 107, and little, if any, time was devoted by counsel to § 103 and § 104. As stated at the conclusion of the argument the court is convinced that the issue raised constitutes a labor dispute. See subdivision (a), § 113 of the Act. Lauf v. E. G. Shinner & Co., 303 U.S. 323, at page 329, 58 S.Ct. 578, 82 L.Ed. 872.

This clearly covers the situation at bar which, as stated, involves an attempt by the labor union to organize the plaintiffs' employees, enforce the closed shop, etc.

The first paragraph of the Norris-La Guardia Act, 29 U.S.C.A. § 101, specifically forbids Federal Courts issuing restraining orders, in cases growing out of labor disputes or contrary to the public policy declared in § 102 (supra). Furthermore, § 103 declares that certain contracts therein

described, or any other undertaking or promise in conflict with the public policy declaration of § 102, are contrary to the public policy of the United States, and shall not be enforceable in any court of the United States, nor afford any basis for the granting of legal or equitable relief by any such court.

The contract, the important provisions of which we have set forth (supra), (Exhibit A), of which plaintiffs seek specific performance, does not deal specifically with rates of pay or schedules, but has for its object the establishment of uniform, minimum rates of pay and working conditions for the members of the union employed by the parties of the first part; that is, the truck operators "as described in the wage scales attached hereto and made a part of this agreement." But no wage scales are attached to, or made a part of, the agreement, nor have the parties entered into any, according to counsel.

■ Paragraph 2 of the contract reserves the right to the employers, the parties of the first part, to discharge any employee for unsatisfactory work, and to assign employees to any classification of employment and determine how and when merchandise shall be moved and the number of employees necessary to perform any particular task or service. Paragraph 3 recites neither party will interfere with or restrain employees in regard to hire or tenure of employment, and paragraph 4 provides that schedules of pay, hours of service and working conditions shall be made for each division of the industry and for each local area, and when made shall become part of the agreement. Paragraph 10 recites the union is not in favor of sympathetic strikes and will do everything to prevent the same, and that there will be no interference with the regular, normal business of the members of the party of the first part because of union or non-union affiliation of any person, firm or corporation with whom members may transact business, except where picket lines have been established. The bill states there has been no picketing. It is easy to see that injunctions restraining the violation of undertakings of this nature are prohibited by § 104, subdivision (a) and (b). Paragraph 14 sets up a board of arbitration for adjusting differences or controversies arising from the interpretation of any provisions of the agreement and matters of mutual concern not covered thereby, other than questions of proper rate of pay. Paragraph 16 covers rates of pay, the agreement being that rates of pay and hours of service and working conditions effective at the date of the agreement shall continue in force to the effective date of any new schedule of rates of pay, hours of service and working conditions. Turning to the prayer, plaintiffs ask the court to declare the contract (Exhibit A), be in full force and effect and that it should be specifically enforced and the defendants, their officers and members, including Keigley and Woxberg, be ordered to perform the covenants of the contract, and particularly not to restrain or coerce any of the employees of any of the plaintiffs to join any particular union or labor organization. Relief of the kind thus asked for is contrary to the public policy declared (§§ 102 and 103), and this court lacks power to comply.

■ Next plaintiffs ask defendants be compelled to refrain from attempting to force any of the plaintiffs to sign a closed shop contract and refrain from threatening to call, and be restrained from calling, any sympathetic strikes. Likewise violating subdivisions (a) and (b), § 103.

A careful analysis of the contract and the relief asked for, and the statute we are discussing, forces the conclusion that the former is contrary to the spirit, and in many instances the letter, of the Act, and the relief prayed for is now beyond the power of the court to grant.

Consciously or unconsciously plaintiffs seek to prevent their employees from becoming members of a labor union and ask the court to restrain the defendant union, which as far as the records disclose has been chosen by the plaintiffs' employees as their bargaining agency, from using lawful means to enforce their demands for a closed shop. All of which is contrary to the broad public policy declarations not only of this particular Act, but of provisions almost identical found in the National Labor Relations Act, 29 U.S.C.A. § 151.

The motion to dismiss is granted.

Counsel will submit proposed findings of fact and conclusions of law and a form of decree dismissing the bill in ten days.