**WILLIAM DUNBAR CO., Inc., et al., Plaintiffs,**

**v.**

**PAINTERS & GLAZIERS DISTRICT COUNCIL NO. 51 et al., Defendants.**

**Civ. A. No. 5255–54.**

United States District Court, District of Columbia
Jan. 12, 1955.

J. E. Bindeman, Washington, D. C., for plaintiffs.

Martin O'Donoghue, Washington, D. C., for defendants.

KIRKLAND, District Judge.

Historically, this case began by the filing of a complaint for an injunction and declaratory judgment in this Court on December 11, 1954. In the main it sets out that there had been an agreement between the parties signed on the 15th day of May, 1953, whereby a certain sum, to wit, 10 cents an hour, was to be paid into a painters' trust fund.

There was an allegation that two corporate plaintiffs had not paid, and as a result of the nonpayment the union had threatened to terminate the May 15, 1950 agreement.

The plaintiffs sought then to enjoin the trustees of the welfare fund from collecting payments and to restrain the union from terminating the agreement.

A motion for a preliminary injunction was filed on the 29th of December 1954, and on the 31st of December, 1954, there was an amended complaint which added another party defendant, to wit, the International Brotherhood of Painters, Decorators and Paperhangers of America.

On January 4, 1955, the defendant union answered to the complaint and asserted a counterclaim.

On the 5th of January, 1955, there was opposition filed on behalf of the union to the motion for preliminary injunction, and on the 7th day of January, 1955, a motion for a temporary restraining order was filed.

This present Court, sitting as a motion court, on the date of January 8 overruled the motion for preliminary injunction and advanced the case for a hearing on its merits.

The case came on for trial January 11, 1955, and at that time waiver of demand for jury trial was filed by praecipe, and there were added four additional parties plaintiff. As against the possibility of a class action suit, it is pointed out that the six plaintiff contractors who have not paid into this special welfare fund from about January 1954, until the latter part of September 1954, are now in the cause as a group of six plaintiffs.

In the amended complaint there were four counts set forth. The first count, which in the main sets forth a grievance, alleges a failure of remedy at law and seeks a declaratory judgment, and prays also for an injunction. Counts II and III have been dismissed by praecipe before the case began. Count IV apparently is still in the case. It claims an infraction, and claims compensation, as well as triple damages.

It is apparent, therefore, from the pleadings, that there are six plaintiffs suing a group of defendants who, in the main, represent two unincorporated labor groups, as well as individual defendants.

The first question before the Court is that of its jurisdiction. In that connection the Court points out that under the Norris-LaGuardia Act the jurisdiction of the federal courts to employ the injunctive process has been, broadly speaking, denied.

Section 113(c) 29 U.S.C.A. states that the term " 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

One will observe that that is a very broad definition of a labor dispute.

Section 107 of 29 U.S.C.A. denies jurisdiction to courts of the United States to issue a temporary or permanent injunction in any case, involving or growing out of a labor dispute, as defined in Section 101–115 of the said Title 29, with five exceptions:

One, that unlawful acts have been threatened and will be committed unless restrained, or have been committed and will continue unless restrained.

Two, that substantial and irreparable injury to plaintiff's property will follow.

Three, that greater injury will be inflicted upon the plaintiff by denial of relief than would be inflicted upon the defendant by granting of relief.

Four, that there is no adequate remedy at law.

And, five, that public officers charged with the duty to protect plaintiff's property are unable or unwilling to furnish adequate protection.

In the main, the application of such injunctive power seems to have been limited to conditions involving unlawful acts which entail violence. Colorado-Wyoming Express v. Denver Local Union No. 13, D.C., 35 F.Supp. 155, decided

by the District Court of Colorado in 1940, held that Title 29, Section 107 of the United States Code Annotated, sets out the only conditions under which a federal court may issue injunctions in labor disputes. And in Wilson & Co. v. Birl, 3 Cir., 105 F.2d 948, decided in 1939, it was held that the unlawful acts mentioned were construed to be acts of violence.

■ It is apparent, therefore, that under this definition of a labor dispute, in view of the positive prohibitions, federal courts generally do not have injunctive powers in labor disputes.

A new and very important element entered into this picture in 1947 when Congress enacted the Taft-Hartley Act, which is reported at 29 U.S.C.A. § 141 et seq. It is necessary to understand what Section 186—also referred to in the statutory bill as Section 302—actually provides. Modifying the general denial to federal courts of injunctive powers in labor disputes, Congress has seen fit in this Act to open the door just a bit, and to define a narrow path for federal courts to trod.

This section provides, in general, that it will be unlawful for any employer to pay, or for any representative of any employees to receive from the employer, money or other thing of value in an industry affecting commerce except "with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents."

The Congress then laid down certain conditions under which the trust fund, as such, should be established. It provided first that the moneys must be held in trust for the purpose of paying for the benefit of employees or their families for medical or hospital care, pensions on retirement or death, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance.

That is a very broad definition, but in the main it declares that these moneys be earmarked, these moneys be set aside, these moneys be used for the specific purpose of what one might properly call welfare benefits.

The second requirement is that the detailed basis on which such payments are to be made is specified in a written agreement with the employer.

Three, that the employees and employers are equally represented in the administration of the fund, together with such neutral persons as the representatives of the employers and the representatives of the employees may agree upon; and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break it, then to shorten it, an umpire is to be designated, and if the parties cannot agree on him, the District Court of the United States where the trust fund has its principal office shall appoint such person.

And, lastly, the trust fund shall also contain provisions for an annual audit, a statement of which shall be available for inspection by interested persons.

Essentially, that is the keystone of this case, by which it must be tested. It is true that there is provision for a fine of ten thousand dollars or imprisonment of not more than a year, or both, for a wilful violation. And it is provided specifically, and this is interesting, in subsection (e) of the same section, that the district courts of the United States "shall have jurisdiction, for cause shown * * * to restrain violations of this section, without regard to the provisions of section 17 of Title 15 and section 52 of this title, and the provisions of sections 101–115 of this title."

With regard to those sections that involve title 15, they deal, in the main, with anti-trust violations.

So there is this very narrow opening in the theretofore solid wall of denial of the power of injunction in cases of labor disputes. It therefore becomes necessary for this particular Court, as a finder

of facts, to pass upon a series of elements.

The first thing which addresses itself to the trial court is whether or not there ever was in existence as a document or as a compelling agreement what has been referred to as Plaintiff's No. 9 for identification and now in the record as Court Exhibit No. 1, to wit, a six-page mimeographed agreement which bears typewritten names purportedly representing the signatures of the signatories to it.

In the year 1947, when the Taft-Hartley Act was under consideration, there is testimony that some representatives of both management and labor went to New York City and Brooklyn, New York, and made inquiry and investigation into the operations of a welfare fund which was then operating in that state.

There is testimony before this Court that the welfare fund in suit in the District of Columbia is the second one in the history of labor. At all events, there has been testimony that with the information gained from that investigation the parties began to draft a composite trust agreement that might work in the District of Columbia. The Court finds that was done and is the fact.

It is borne out by such perfectly unbiased testimony as that of the representative of the Bureau of Internal Revenue, who testified that in the month of April, 1947 there was received in his office an inquiry as to whether, if that agreement came into being, union and management would receive the benefit of tax exemptions for charitable trusts with respect to it.

That letter is dated April 27, 1947, and it refers to an enclosure. There was a reasonably prompt reply, dated July 14, 1947, in which, acting upon the evidence of the mimeographed agreement, the Bureau of Internal Revenue of the Treasury Department of the United States declared that the trust would be exempt.

That is one item in the scale that goes to the existence of an agreement.

Secondly, we have in the case evidence that an outstanding firm of certified public accountants, Ernst & Ernst, for a period, the Court recalls, of the entire life of the trust fund, from 1947 to 1954, and into the current year, 1955, annually certified that their audit revealed that these trust funds were being kept in accordance with the trust agreement of April 1, 1947. That is another element in the scale.

Beyond those two elements, we have the testimony first, on behalf of the plaintiff, through the witness John H. Davis, that his signature was never affixed by him to this instrument at any time, in his handwriting. He testified that he was one of the early participants in the attempt to bring into being the welfare trust set-up, and that he did receive—in corroboration of the testimony by the administrator that it was sent out July 1st—one of these mimeographed documents and it bore his signature, although he testified under oath he did not sign it in fact. He has testified that while he got the document, he did nothing about it.

There is also evidence in this cause that he was named a party plaintiff in Civil Action 1390–48, in which there was a complaint to cancel, rescind and set aside a trust agreement, and to terminate a trust. The particular trust referred to is the one which is the subject of the agreement dated April 1, 1947. The Court gained the impression first that he ordered it withdrawn in his name because he sued individually, and then the testimony was that he had not authorized the suit. It appears to the Court a very strange thing for one to sign his name so freely to public documents of which he doesn't have notice and as to which he does nothing to protect his good name.

The record of that case shows it was filed April 5, 1948, and it was dismissed first by a praecipe of his then attorneys Michael F. Kehoe, J. Robert Carniff, and Richard H. Love on the date of April 14, 1948, apparently without prejudice. On the date of May 19, which is a considerable length of time later, it is

dismissed with prejudice, his signature appearing only individually and in no other capacity. It is signed also by J. E. Bindeman, attorney for John H. Davis, individually.

That is a strange situation, to say the least, with a general dismissal and a particular dismissal with prejudice against only the person individually. But it is another element to be placed in the scale, and one which leads the Court to believe that Mr. Davis must have had some knowledge at the outset of this trust attempt in the year 1947, and certainly on July 1, 1947.

The next typewritten signature which appears on the document in question is that of Ernest Parks. We have had the benefit of Mr. Park's testimony in court. He is a very intelligent man. He has testified that his name in fact is Ernest A. Park. However, the gist of his testimony is that he cannot say whether he did or did not sign this particular document. His testimony, as the Court recalls, was that he did not remember, at the present time, whether he signed it or not. Yet he is put on the stand and his testimony proffered to support the theory that it never existed and that he did not sign.

Against that there is the testimony of Max Schriber who appeared and was called as a witness by the Court and cross-examined by both sides. He testified that he did sign it with his signature, and that when he did the signatures of the presidents of the three local unions had already been affixed. He is not clear in his recollection as to whether there were open lines above, but he is positive that labor had signed, and he did sign.

The Court does find, so far as the execution of this document is concerned, that it was signed in fact. Whether it is in the status of a lost, misplaced document, or not, there has been a sufficient showing, in the absence of the original, to convince this Court that this document was given life by formal signatures and did exist as a trust obligation.

The Court finds further as follows, and in order that it may be clear, the Court will allude to some of the exhibits which are in front of the Court.

There was introduced and received in evidence Plaintiff's Exhibit No. 1, which is termed an area contract. It bears no date, as such, but it does assert that it was entered into on the 1st day of April, 1945, and apparently continued for a period of two years.

The Court refers to it particularly because nowhere in that area agreement, which the representatives of labor and the individual shop owners signed, is there any reference to this trust agreement or the method of its operation.

In Plaintiff's Exhibit No. 2, which is an agreement which was entered into on April 1, 1947, Article X states that the parties to this agreement agree to set up a trust fund to be known as the Painters Insurance Fund of Washington, D. C. and vicinity. The purpose of this fund is to provide life insurance, sick benefits, hospitalization, accident, surgical and dismemberment benefits for all journeymen and apprentices of Local Unions 368, 890, and 797.

There follows in the next paragraph the stipulation that the party of the first part—which is the individual contractor—agrees to contribute 3 per cent of the gross weekly pay.

There is also agreement on the part of both as to the selection of trustees.

There is agreement that the party of the first part, which is management, agrees to make a deposit with the trustees of $250 to be a credit against future payments of the payroll contribution. It also provides that all other contractors of other jurisdictions, other than the parties signatory, shall be subject to the same deposit.

It has been argued by counsel for the plaintiffs that the language, "The parties to this agreement agree to set up a trust fund," is to be construed to mean that those coming to the District and later engaging in the occupation of painting contracting were to be bound.

The Court does not agree with that argument. The whole tenor of Article X appears to the Court to indicate that as the result of an emergency created by the need to get a closed shop or a collective bargaining agreement signed, there were some provisions which were left to the future, notably the trust fund. That is why the language indicates a future action. That fact is also borne out by the fact that there was left open the matter of working out the wages. Wages had not been agreed upon when this contract was signed on April 1, 1947.

Plaintiff's Exhibit No. 3 is headed "Supplemental Agreement," and it does supplement Article II, page 1, of the then existing labor agreement entered into on the 1st day of April, and it does provide what shall be the payment for journeymen in the District of Columbia. The one introduced in evidence was signed on behalf of the union April 13, 1948. So that indicates to the Court that at least the question of hourly wages for journeymen had been a matter of future agreement.

The Court's opinion is also bolstered by the fact that there was issued Defendants' Exhibit 1–D, a blue book which sets forth in great detail all the benefits that would inure from the trust fund.

Accordingly, with the Court finding as a fact that there was a trust agreement in existence setting out how much should be paid by management, the detailed basis on which payments were to be made, by way of benefits, we are strictly up against a construction of Title 29 U.S.C.A. § 186, and particularly (c) (5) (B) thereunder.

The words are: "The detailed basis on which such payments are to be made is specified in a written agreement with the employer." It has been argued on one side that this language should be strictly construed. It has been argued on the other side that it should be liberally construed. It has been argued that it means a signed agreement. The other side contends that it means an agreement reduced to writing, if there is a meeting of minds and an assent thereto.

The Court rules as a matter of law that this requirement of the Taft-Hartley Act is nothing more than the requirement that there shall be a written agreement. It does not declare that it shall be a signed agreement. If that were necessary, Congress undoubtedly would have put it into the act itself.

Going on from there, it is pointed out that in all the area agreements thereafter entered into, wherever there is a change it is referred to as an amendment to the trust agreement of April 1, 1947. There is even testimony in the case that as late as 1954 management met and discussed amendments to the then existing trust.

Also, there is testimony in the case that beginning in January, 1954, the six plaintiffs stopped making payments of 10 cents per hour, but there was testimony adduced on cross-examination on behalf of the defendants that benefits were, nevertheless, paid throughout that period.

Under the doctrine of equitable estoppel, and under the principle of quasi contractus, that would bring into being a trust agreement—the fact that the money is earmarked and in the bank; the fact that it is annually audited; the fact that whoever wants to examine it may, and there was testimony from Mr. Peisner that some did; the fact that there is a written agreement, the trust agreement of April 1, 1947, in which the terms are fully spelled out, and spelled out by the booklet that described the benefits, and spelled out by the area contract as to what payments were to be made; and the fact that there were employees and employers sitting in equal number on this board. There was a deadlock and the deadlock was broken by the appointment of not an arbitrator, not a referee, but broken by what the witness Mr. Peisner called an umpire.

Because the funds were expended on one side of this contract and benefits received and accepted, clearly the plaintiffs are estopped by equitable estoppel from asserting that they had not a right or were under no duty to pay these sums.

■■ That leads us to the question of whether they may safely rely upon what has been a line of testimony, that an assistant United States attorney, Mr. Casey, had advised one of them as late as July, 1954, that if payments were made there might be a criminal prosecution under the Taft-Hartley Act. I feel that the assistant United States attorney made one fundamental mistake. He did not realize that there is, broadly speaking, a denial of statutory injunctive power. Until this particular Section 186 came into being no power lay, and no trust funds had ever been created. To enforce it a criminal penalty was attached, because, apparently, as both sides have argued, and argued very fluently, there was potential vice in these funds not being properly deposited, not being properly supervised, not being properly audited, not being properly distributed, and in the fact that they could become a slush fund. They could become the source of crime, embezzlement, and they might be used for many improper things. He may have had that in mind.

There is in the preamble of this section the language that he probably overlooked, and that is, that "it will be unlawful for any employer to pay, or for any representative of any employees to receive from the employer, money or other thing of value in an industry affecting commerce except with respect to money or other thing of value paid to a trust fund."

That language was very deliberately intended to prevent kickbacks, prevent bribes, prevent things which would make for labor racketeering. And the business of exculpating the trust was put in there, that beyond the penalties which are purely criminal, there could be injunctive powers for quick and speedy remedy.

The Court therefore rules that the advice, as such, was not sound, it was not true, and that while the plaintiffs in good faith acted upon it, they were not entitled to do so as a matter of complete defense.

Accordingly, this Court now holds that there was a contract in being in the year 1947 in which the conditions of work and all except journeymen's wages were settled, on the 1st day of April, 1947. That was supplemented by the provision which came later as to what journeymen wages should be, and it was supplemented in October by the creation of a trust fund to which the payment of 3 per cent of wages should be made in periodic payments, to wit, quarterly. It was in effect and was honored. Even if one argues that there was defect in formal execution, there was still a contract, on the basis of a quasi-contract, and equitable estoppel will prevent assertion that the payments are not now due.

The Court will accordingly hold as a matter of law that the plaintiffs are in breach of this contract by not having paid the sums at the rate of 10 cents per hour during the period from January 1 until the point of quitting and the formation of the new contract which came into being in 1953.

The Court will hold as a matter of law, since there is a breach and the breach lies on the part of the plaintiffs, that the plaintiffs are not entitled to a judgment declaring that their's is the correct interpretation and that there was no contract of trust in being.

The Court holds that one who breaches a contract as here may not enjoin labor which has a right to assert its main weapon of the strike.

The Court will hold further that if there are in fact picket lines about a building, to wit, Arlington Towers, it is a labor dispute, and the Court is ousted of jurisdiction by Sections 113(c) and 107 of Title 29, United States Code Annotated, and that it is a matter which would have to come before another tribunal.

There is a cross-claim in this case for money damages on behalf of the defendants. The Court will enter a judgment to be fixed by a reference to the Auditor of the Court to determine how much the amount is. In the event that counsel can agree on the amount themselves, the Court will enter that amount as a judgment.