**BRICKLAYERS, MASONS AND PLASTERERS INTERNATIONAL UNION OF AMERICA, LOCAL UNION NO. 15, ORLANDO, FLORIDA, et al., Plaintiffs-Appellants,**

v.

**STUART PLASTERING COMPANY, INC., et al., Defendants-Appellees.**

No. 74–2087.

United States Court of Appeals, Fifth Circuit.

May 12, 1975.

Ronald G. Meyer, Richard H. Frank, Tampa, Fla., for plaintiffs-appellants.

Plasterwalls, Inc., pro se.

Before BROWN, Chief Judge, and MURRAH * and WISDOM, Circuit Judges.

WISDOM, Circuit Judge:

Section 302 of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, prohibits payments by an employer to labor organizations or to their representatives. One exception, Section 302(c)(5), 29 U.S.C. § 186(c)(5), permits an employer or association of employers to make specified payments to certain "trust [funds] established by such representatives". Here, a collective bargaining agreement established a schedule of payments for participating employers to make health and welfare payments and pension payments to a union's health and welfare fund. A trust agreement for the proposed health and welfare fund was drafted and executed by two employers engaged in the plastering business in Orlando, Florida, but it was not executed by any of the defendant employers. A

---

* Senior Circuit Judge of the Tenth Circuit sitting by designation.

pension fund trust agreement was also drafted, but it was not executed by any employer who was allegedly a party to the collective bargaining agreement. The question this appeal presents is whether the schedule of payments set out in the collective bargaining agreement, by itself and in the circumstances of this case, satisfies the requirements of Section 302(c)(5) and imposes on the employer an enforceable obligation to contribute the disputed health and welfare payments and pension payments. We hold that it does not.

I

The collective bargaining agreement at the heart of this dispute was signed by George Stuart, as representative of the Plasterers Association, and by Don Goad, as representative of Local 15, on December 15, 1968. The relevant section of that agreement is Article II, Section 4. This section sets forth a schedule of payments to be made by participating employers for health and welfare benefits and pension benefits, effective March 1, 1969, and continuing for the life of the contract, which expired on February 28, 1973. The agreement provides that "the following amounts [specified thereafter under the "health and welfare" benefits schedule and the "pension" benefits schedule] shall be paid into health and welfare fund". The agreement also provides that "[s]uch fund shall be designated by Local No. 15, Plasterers International Union of America, Orlando, Florida".

■ The collective bargaining agreement specifies that both types of payment be made to a single "health and welfare fund". That provision, as is evident, is in violation of Section 302(c)(5)(C), requiring that payments made by employers for use as pension benefits "be made to a separate trust, which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities".

■ Under the collective bargaining agreement, the health and welfare fund, to which payments should be made by participating employers, "shall be designated by Local No. 15". Moreover, Section 302(c)(5) of the Act places the burden of going forward with the establishment of qualifying trust funds on the union representatives. Specifically, it provides an exception to the general prohibition of Section 302 for employer payments "paid to a trust fund *established by such* [union] *representative,* for the sole and exclusive benefit of the employees of such employer" (emphasis added). No trust agreement establishing a pension fund was executed by anyone, and the health and welfare trust agreement was not signed by any of the defendants. The union suggests, on an estoppel theory, that compliance with the strict requirements of Section 302(c)(5) is unnecessary because some contributions of health and welfare benefits and pension benefits were made. They contend that those contributions are sufficient proof of the existence of a trust fund to satisfy their obligation under the National Labor Relations Act.

The record demonstrates that Stuart made some payments, both for health and welfare benefits and for pension benefits, as set forth in the collective bargaining agreement schedule. Those payments were made to All State Administrators, Inc., a corporation organized by Stuart, Don Goad, the union representative, and David Foley, an insurance broker, for the purpose of administering these fringe benefit funds for their individual profit. All State Administrators was one of several corporations organized by Stuart and Goad, for their individual purposes, during the period that they were negotiating the collective bargaining agreement on behalf of their respective principals. Both Stuart and Goad later misused some of the fringe benefits money that the participating employers paid into All State. Stuart used part of the money to satisfy delinquent withholding taxes that were due from his plastering business. Goad used part of the money to finance his unsuccessful campaign for re-election as Business Manager of Local 15. The various

infirmities and delinquencies connected with the administration of the fringe benefits money surfaced only after Goad's defeat in the re-election campaign, when Goad crossed the aisle to join Stuart on the management side, and a new union administration uncovered the previous irregularities.

Francis Snider, Goad's successor as Business Manager of Local 15, informed participating employers, on March 1, 1970, that they should make no further pension contributions to All State Administrators. He instructed them to make payments, instead, to an escrow account to be designated by the union. The reason for this change in method of operation, as stated in the letter, was that: "[i]mplementation of the pension program, consistent with federal law has not occurred. The required trust agreement has neither been drafted or approved. In addition, it appears that trustees who will serve in the administration of the pension fund have not yet been appointed." Snider did not give his reasons for believing that the pension fund was not lawfully organized after a year of its supposed operation, and he did not offer any legal authority for his instruction that the employers should make future payments to a union-designated escrow account. Without indicating any legal basis for a different approach to the health and welfare fund, he ordered the employers to continue making health and welfare payments to All State. By affidavit, Stuart testified that he paid pension fund contributions directly to his employees after March 1, 1970.

On September 25, 1970, Snider informed the participating employers, again cryptically, that the Local 15 membership had "voted down all fringe benefits at a special meeting" and that the employers, therefore, should withhold payments to both funds or, alternatively, make payments directly to their respective employees, until further notice by the union officials. By affidavit, Stuart set out the details of health and welfare payments, and alleged that he had attempted, in light of the confusion surrounding the propriety of payments to the fund,[1] to follow the wishes of his employees, who sometimes wished payments to be made directly to them and, at other times, to the fund. These facts indicate the uncertainties of administration that Congress intended to eradicate in the enactment of Section 302.

In the first round of this litigation, the alleged trustees of the union's health and welfare fund sought recovery of the money paid to All State Administrators and later misused by Goad and Stuart. See Snider v. All State Administrators, Inc., 5 Cir. 1973, 481 F.2d 387. The present suit, brought under Section 301,[2] 29 U.S.C. § 185, to compel payments that Stuart allegedly owed and did not pay in due course, was initiated by Local 15 and the alleged trustees of the pension fund. The complaint was later amended to include the alleged trustees of the health and welfare fund. The union maintains that Stuart Plastering Co. and its alleged successors[3] failed to comply with their duty under the collective bargaining agreement to make specified payments into the union health and welfare

---

1. Considerable doubt was initially cast on the payment procedures when the alleged trustees of the health and welfare fund brought suit in Snider v. All State Administrators in October 1969.

2. Section 301 of the National Labor Relations Act, now codified as 29 U.S.C. § 185, provides in relevant part that:

   (a) Suits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be

brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

The plaintiffs also sought a declaratory judgment under 28 U.S.C. § 2201 and further necessary or proper relief under 28 U.S.C. § 2202.

3. The successorship question is not relevant to our disposition of this case. For the sake of simplicity, we will hereafter refer to the respondents as "Stuart" or "the employer".

fund and the pension fund. Stuart contends [4] that it had no obligation to make the disputed payments because the instruments relied on by the plaintiffs do not meet the necessary prerequisites for settling a qualifying Taft-Hartley Trust in accordance with Section 302(c)(5).[5] Stuart insists, therefore, that such payments would be unlawful under Section 302(a) [6] and would subject it to possible criminal liability under Section 302(d).[7]

The district court granted Stuart's motion for summary judgment, stating: "[t]here is no genuine issue of fact as to the non-existence of a written agreement signed by any of the defendants conforming to the requirements of 29 U.S.C. § 186 which is an absolute prerequisite to any obligation on the part of the defendants . . . to make pay-

ments to a pension and/or health and welfare fund represented by the plaintiffs." The appellants now contend that the district court improperly granted summary judgment for the defendants, because the writings in the record were sufficient to meet the requirements of Section 302 and thus imposed on Stuart an enforceable obligation to make such payments.

## II

The district court granted the defendants' motion for summary judgment when it found, on the basis of the record before it, that there was "no genuine issue of fact as to the non-existence of a written agreement signed by any of the defendants conforming to the requirements of 29 U.S.C. § 186". The plain-

**4.** Stuart is apparently unable to bear the financial burden of this appeal; it did not file a brief in this court and was not represented by counsel at oral argument. We have stated Stuart's position here by restatement of the contentions it raised in the court below.

**5.** 29 U.S.C. § 186(c)(5) provides in relevant part that:

(c) The provisions of this section shall not be applicable * * * (5) with respect to money . . . paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer . . . *Provided,* That (A) such payments are held in trust . . . (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon . . . and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons at the principal office of the trust fund and at such other places as may be designated in such written agreement; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities.

**6.** 29 U.S.C. § 186(a) provides that:

It shall be unlawful for any employer or association of employers or any person who

acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; or

(3) to any employee or group or committee of employees of such employer employed in an industry affecting commerce in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or

(4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.

**7.** 29 U.S.C. § 186(d) provides that:

(d) Any person who willfully violates any of the provisions of this section shall, upon conviction thereof, be guilty of a misdemeanor and be subject to a fine of not more than $10,000 or to imprisonment for not more than one year, or both.

tiffs, as well as the defendants, moved for summary judgment. The court held two hearings on the defendants' motion before it finally granted summary judgment.

█ Under Fed.R.Civ.P. 56(c), summary judgment shall be granted "if the pleadings, depositions, answers to interrogations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed. See 6 Moore's Federal Practice ¶ 56.13, p. 2247 (1974); Volunteer State Life Insurance Co. v. Henson, 5 Cir. 1956, 234 F.2d 535. The rationale for this rule, of course, is that each party moving for summary judgment may do so on different legal theories dependent on different constellations of material facts. Indeed, cross-motions for summary judgment may demonstrate a genuine dispute as to material facts as often as not. Judge Jones discussed this principle in light of the facts in *Henson*:

> "We need not say that the one affidavit contradicts the other, but each affidavit tends to and was intended to support the theory of the party offering it. Other affidavits offered by the one side or the other create or empha-

size differences between the facts asserted and the legal theories advocated by the respective parties."

234 F.2d 535, 537. Nonetheless, cross-motions may be probative of the non-existence of a factual dispute when, as here, they demonstrate a basic agreement concerning what legal theories and material facts are dispositive. The record here indicates that the only genuine issue in this case concerns the legal sufficiency of the documents to constitute a "writing" in compliance with Section 302.

The record contains all the relevant documents that the trial court considered in granting summary judgment. The collective bargaining agreement itself was appended to the complaint as "Exhibit A", and the two trust indentures were attached as exhibits to the defendants' requests for admissions. In response to those requests, the plaintiffs admitted that the Pension Trust Fund indenture is "genuine and the only document being relied upon by the Plaintiffs to prove their allegations . . . that the defendants were required to and failed to make payments to such pension trust fund besides the Collective Bargaining Agreement."[8] They admitted also that the Health and Welfare Fund indenture "is genuine and the only document being relied upon . . . to prove their allegations . . . that the defendants were required to and failed to make payments to such Health and Welfare Fund, besides the Collective Bargaining Agreement".[9]

---

**8.** In the admissions filed November 26, 1973, the plaintiffs qualified their admission concerning the Pension Fund indenture by stating that it is "*an unexecuted copy* of the declaration of trust which was formally adopted and executed by the proper trustees of the Fund" (emphasis added). This qualification was probably intended to create a genuine issue of material fact. See Local Union No. 529, United Brotherhood of Carpenters v. Bracy Development Co., W.D.Ark.1971, 321 F.Supp. 869, 876; Dunbar v. Painters & Glaziers District Council No. 51, D.D.C.1955, 129 F.Supp. 417, 422. That qualification has long since been abandoned; the plaintiffs now admit that the declaration of trust was never executed in fact. The plaintiffs do not allege in their brief

on appeal that the declaration of trust was executed, and counsel for the plaintiffs admitted at oral argument that the declaration of trust was not signed. They now take solace from the dictum rather than the holding of *Dunbar*. See 129 F.Supp. 417, 422–423 and 312 F.Supp. 869, 876. Francis Snider, Goad's successor as Business Manager of Local 15, wrote to participating employees on March 1, 1970, and directed them to make future pension fund payments to an escrow account because the "required trust agreement has neither been drafted or approved." This letter is in the record.

**9.** Plaintiffs qualified this admission by stating that it is a genuine document but they questioned "the circumstances surrounding its cre-

■ That the evidence in a case consists mainly of documents is, of course, insufficient by itself to warrant summary judgment. Commercial Metals Co. v. Walker, 5 Cir. 1971, 439 F.2d 1103. The district court was justified in determining that the only issue to be resolved was that of the legal sufficiency of the documents in light of the requirements of Section 186. Summary judgment was appropriate under Fed.R.Civ.P. 56 because there was no genuine issue as to any material fact.

### III

The question at issue turns on the proper construction of Section 302.

■ The design of Section 302 discloses two basic congressional concerns. First, Congress intended to subject to close regulation the administration of union funds providing employee fringe benefits such as pensions and health and welfare payments. Congress wished to remove these funds from the absolute control of union officials by giving employers a co-ordinate responsibility for their administration.[10] Second, Congress intended to prohibit special payments by employers and employer associations to employees, employee organizations, and officers of such organizations, except on

conditions carefully prescribed by law.[11] One of these exceptions to that general prohibition permits employers to make payments to a trust fund established for the sole and exclusive benefit of their employees and families, for the purpose of paying for medical or hospital care, pensions, compensation for employment-related injuries and illnesses, unemployment benefits or life insurance, disability and sickness insurance, or accident insurance. The requirements that must be met in establishing a valid Taft-Hartley trust are prescribed in Sections 302(c)(5)(B) and 302(c)(5)(C).

■ Section 302(c) is a narrow exception to the general prohibition of employer-employee payments contained in Sections 302(a) and 302(b). Strict compliance with the terms of Section 302(c) is required to settle a qualifying Taft-Hartley trust. As Judge Waterman said in Moglia v. Geoghegan, 2 Cir. 1968, 403 F.2d 110, 115: "[a] reading of the legislative history of Section 302 shows that Congress intended to prohibit the establishment of any union funds by means of employer payments unless the funds conformed *in all respects* with the specific dictates of Section 302(c)".

Section 302 requires adherence, in the settlement of Taft-Hartley trusts, to a

---

ation and adoption". The Health and Pension Fund trust indenture was not signed by Stuart or by anyone connected with Stuart Plastering. The employers who signed the instrument were Claud McCullogh and W. S. Pyne. In terms, the instrument bound only "[t]he undersigned Employers [McCullogh and Pyne] and such other Employers who may hereafter become parties to this Agreement by executing an Agreement to be bound by this Agreement." By qualifying their admission, the plaintiffs may have wanted to leave open the avenue to proving that Stuart delegated to Pyne and McCullogh the power to bind Stuart Plastering to the agreement. They made no further offer of proof. "If the non-existence of any genuine issue of material fact is established by such credible evidence that on the facts and the law the movant is entitled to judgment as a matter of law, the motion should be granted, unless the opposing party shows good reason why he is at the time of the hearing unable to present facts in opposition to the motion." 6 Moore's Federal Prac-

tice ¶ 56.15[3], p. 2339 (1974). On appeal, the plaintiffs shift their attack and allege only that "[a]lthough Stuart did not sign the declaration of trust establishing the health and welfare trust fund, he, for a period of time, contributed the prescribed amounts to the employee health and welfare fund in accordance with the fringe benefit schedule established by the collective bargaining agreement." This language would suggest a ratification or adoption theory.

10. At the time of the enactment of the Taft-Hartley Amendments, Congress was particularly concerned with the control John Lewis exercised over the United Mine Workers' welfare fund. See II Legislative History of The Labor Management Relations Act of 1947, pp. 1304–1313 (1948). See also A. Cox, Some Aspects of The Labor Management Relations Act, 1947, 61 Harv.L.Rev. 1, 291–292 (1947).

11. See especially I Legislative History of The Labor Management Relations Act of 1947, pp. 458, 798–799.

purposefully rigid structure of design to insure that employer contributions are made only for proper purposes and that fund benefits reach only proper parties. Senator Ball, one of the managers of this legislation in the Senate, aptly expressed the legislative purpose when he said that "unless . . . such funds, when they are established, are really trust funds and are actually used for the benefit to employees specified in the agreement, there is very grave danger that the funds will be used for the personal gain of union leaders, or for political purposes, or other purposes not contemplated when they are established, and that they will in fact become rackets." 93 Cong.Rec. 4678 (1947). Judge Waterman reiterated this congressional concern, and the co-ordinate need for its strict judicial enforcement, when he said in *Moglia* that "[a]ny erosion of the strict requirements of the section could provide an unintended loophole for the unscrupulous, and could result in a diversion of funds away from the proper parties as had occurred before Section 302 was enacted." 403 F.2d 110, 116.

The Section 302(c) exception to the general prohibition of employer-employee payments requires that an employer's payments be made "to a trust fund." This requirement that payments be made to a trust fund presupposes the execution of formalities that prevent the allocation of trust assets for purposes not contemplated when the trust fund is established. By incorporating the trust mechanism into the design of Section 302, Congress clearly intended to draw upon established principles of state trust law as a means of regulating employer-employee payments.[12] Consequently, the courts have narrowly construed the federal civil remedy provided in Section 302(c). Judge Simpson of this Court, surveying this difficult intersection of state and federal law, has pointed out:

Trust funds for the benefit of union members are established under the laws of the respective states. Federal law affects union trust funds only to the extent that Congress has elected to exempt employer contributions to such funds made under the terms of a labor-management contract from the general prohibition on employer payments to employee organizations. While Congress thought it necessary to prevent potential abuse of this exemption to stipulate the conditions under which payments can be legally made, State authority remains the legal foundation upon which such funds are constructed. Snider v. All State Administrators, Inc., 5 Cir. 1973, 481 F.2d 387, 390.

■ The objective of this legislation was to guarantee that payments made by employers were used to provide employees with the benefits to which they were entitled under a collective bargaining agreement. Congress chose to effectuate this purpose by providing for trust funds in which employees, as trust beneficiaries, would have a legal right to supervise the administration of the funds to the extent of enforcing the provisions of a trust agreement against faithless fiduciaries. Senator Taft, a principal architect of the legislation, explained in the debates that "the purpose of the provision is that the welfare fund shall be a *perfectly definite fund*, that its purposes shall be that each employee can know what he is entitled to, can go to court and enforce his rights in the fund, and that it shall not be, therefore, in the sole discretion of the union or the union leaders and usable for any purpose which they may think is to the advantage of the union or the employee." 93 Cong. Rec. 4876 (1947) (emphasis added). The Supreme Court acknowledged this aspect of the congressional intent: "Congress believed that if welfare funds were es-

---

12. See II Legislative History of The Labor Management Relations Act of 1947, pp. 1304, 1311. Cf. J. Welch & H. Wilson, Applicability of Traditional Principles of Trust Law To Un-

ion And Management Representatives Administering Taft-Hartley Trusts, 22 Lab.Law J. 671, 674–75 (1972).

tablished which did not define with specificity the benefits payable thereunder, a substantial danger existed that such funds might be employed to perpetuate control of union officers, for political purposes, or even for personal gain." Arroyo v. United States, 1959, 359 U.S. 419, 426, 79 S.Ct. 864, 868, 3 L.Ed.2d 915.

It is impossible, of course, to ascertain at the establishment of a fixed contribution type employee benefit plan [13] what precise payments will be available for distribution to beneficiaries at some future date. The level of those payments can be established with certainty only by reference to general economic conditions, investment yields, the relative strength of a particular established fund, and the actual and projected levels of demands made upon the fund for payments at any specific time. Because of this confluence of complex economic considerations, trustees of a fixed contribution trust fund must, in most circumstances, be accorded some discretion in determining questions of eligibility and the precise contours of benefits to be awarded. See D. Fellers, A General Theory of the Collective Bargaining Agreement, 61 Calif.L.Rev. 633, 732–33 (1973); R. Goetz, Developing Federal Labor Law of Welfare and Pension Plans, 55 Cornell L.Q. 911 (1970). In a fixed contribution plan, and unlike a fixed level of payments plan, the employee's primary source of protection lies in the rigorous standard of fiduciary duty owed by a trustee to the trust beneficiaries. In the absence of a valid trust agreement, or at least the appointment of trustees, this important source of protection is lost.

■ The existence of a trust fund that meets the requirements of applicable state law is a prerequisite to lawful employer payments to a trust fund under Section 302(c)(5). In addition, however, Section 302(c)(5) sets forth its own special requirements. The first of these is that the burden of establishing a qualifying trust fund must be met by the employee organization representative;

the statute clearly prescribes that payments may be made "to a trust fund established by such representative". It may not be assumed, therefore, that the employer's obligation to make payments specified by the collective bargaining agreement exists in the absence of a trust agreement.

■ A writing is not categorically required to settle a viable trust. G. G. Bogert and G. T. Bogert, Handbook of The Law of Trusts § 21 (1973); 1 A. Scott, The Law of Trusts §§ 17 & 17.1 (2d ed. 1956). Section 302(c)(5), on the other hand, specifically requires that employee payments must not only be held in trust, but that "the detailed basis on which such payments are to be made" must be "specified in a written agreement with the employer." Moreover, the written agreement must provide a mechanism for resolving possible disputes between the employee representative trustees and their employer counterparts. The written agreement must also provide for an annual audit of the trust fund. Finally, under Section 302(d), payments earmarked for pension benefits must be segregated from payments intended for any other proper purpose, and a separate trust fund must be established for the purpose of safeguarding pension payments. Taken together, the state and federal requirements constitute a double-tiered system of purposefully rigorous regulation of union fringe benefit trust funds. Judicial adherence to the intention of Congress in enacting Section 302 requires strict enforcement of the purposefully rigid structure provided in this section.

Local 15 contends that an enforceable obligation to contribute to a "trust fund" was created by the collective bargaining agreement here. Essentially, the appellants contend that the mere existence of "a writing" is sufficient to comply with the requirements of Section 302. In their view, it is not necessary to determine whether the writing contains in fact the specific provisions that Section

---

**13.** For a discussion of the differences between fixed contribution and fixed benefits plans, see J. Williams ed., Labor Relations And The Law 628–29 (3d ed. 1965).

186 explicitly requires such a writing to contain. The thrust of its argument is that the execution of a collective bargaining agreement *anticipating the creation of a trust fund* (which may or may not take place thereafter) is a sufficient written agreement to comply with the statutory requirements if it merely states a schedule of payments that an employer is required to make to the "trust fund" during the life of the contract. The flaw in this argument is that although the amount of required payments may form the focus of a union's interest in fringe benefit funds, that limited perspective does not epitomize the congressional concern that led to the enactment of Section 302.

Alternatively, the appellants contend that the collective bargaining agreement was a sufficient writing because it incorporated by reference essential terms that were contained in other writings, although they were absent in the collective bargaining agreement itself.

The collective bargaining agreement here is clearly limited in its terms to a statement of payment amounts required at various points in time. Article 2, Section 4, entitled "Fringe Benefits", provides:

> In addition to above wage scales as outlined in Article 2, Section 1 & 2 above, the following amounts shall be paid into health and welfare fund. Such fund shall be designated by Local No. 15, Plasterers International Union of America, Orlando, Florida. These amounts shall begin March 1, 1969, and continue for life of this contract as dates indicate. [Hereafter follows a schedule of payments to be made biennially for two categories of benefits called, respectively, "Health and Welfare" and "Pension".]

In terms, this provision of the collective bargaining agreement contemplates the creation of a single "health and welfare fund". The purpose of that fund would be to hold both "Health and Welfare" and "Pension" funds. That scheme, of course, violates the plain language of Section 302(c)(5)(C), which requires that "such payments as are intended to be used for the purpose of providing pensions or annuities for employees [must be] made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities". Moreover, the collective bargaining agreement makes no provision for any annual audit or for any mechanism that would effectuate the breaking of trustee deadlocks.[14]

The appellants acknowledge these infirmities. Indeed, Local 15 Business Manager Francis Snider, in a letter dated March 1, 1970, informed participating employees that no pension fund had been established that conformed to legal requirements, and that the employees should discontinue payments to the pension fund until a qualifying trust could be established. Of course, he did not refer to the language of the collective bargaining agreement, which would cast doubt on the possibility of establishing a qualifying fund. Later, on September 25, 1970, Snider informed them that Local 15 had "voted down all fringe benefits at a special meeting" and that the employers should hold payments to both funds until further notice. He also told them that "[i]f you are now paying these benefits directly to the employee as part of their wages you may continue to do so". This assumption of control by the union business manager and his direction to pay fringe benefits directly to the union members would seem to constitute a plain violation of Section 302. Yet, the appellants contend that a schedule of amounts to be paid into "the fund" constitutes the only essential element that is practically subject to negotiation and

---

**14.** The paucity of material detail in the collective bargaining agreement should be considered in light of the thorough attention that Goad and Stuart, the union and employer representatives, gave, at the same time, to the task of setting up seven corporations for the purpose of managing the trust funds for their personal profit. See Snider v. All State Administrators, Inc., 5 Cir. 1973, 481 F.2d 387, 388.

agreement in the collective bargaining context. All other matters, they suggest, must be left to future negotiation.[15]

In this view, the establishment of a payment schedule is sufficient both to fasten upon the employer a duty to contribute the specified amounts and to protect him from criminal liability for doing so. This argument, of course, raises a serious question as to how the prophylactic policy of Section 302(c) is to be implemented if, as here, an employer has a duty to make specified payments to a trust fund whose existence in specific terms is an entirely independent event and not logically prior to the employer's duty to contribute.[16] It is difficult to square the language of Section 302(c)(5), which makes the employer's right to contribute to such funds contingent on their *establishment* by union representatives, with such a theory of employer liability. Presumably, the *establishment* of such funds entails compliance with the specific requirements set out in the statute itself.

In short, the policies of the section, with regard to a careful delineation of trustee powers and duties, cannot be accomplished if an employer's duty to make payments arises *in anticipation* of the creation of a trust fund that, as here, may never be created in fact. To adopt the appellants' liberal construction of Section 302(c) would subvert the intent of Congress and license the loose management of fringe benefit funds. This, Congress specifically sought to prevent. It occurred here with respect to those amounts that were in fact paid into "the fund" only to be used by Stuart and Goad for their individual purposes. See Snider v. All State Administrators, Inc., 5 Cir. 1973, 481 F.2d 387.

Alternatively, the appellants contend that the collective bargaining agreement was a sufficient written agreement under Section 302(c) because it incorporated by reference the terms of other writings that did, in fact, supply the essential provisions required by statute. We cannot accept this approach.

---

**15.** As a practical matter, this position is subject to serious doubt because of the already complex and sophisticated character of modern collective bargaining agreement. See Inland Steel Co. v. N.L.R.B., 7 Cir. 1948, 170 F.2d 247, 248–49, in which the Seventh Circuit held that the complexity of pension fund provisions would not remove them from the area of mandatory collective bargaining subjects. The appellants contend that the custom in collective bargaining is to agree only on the *amount* of contributions that employers are required to make under the terms of the agreement. Obviously, this may be the case when union and management have engaged in previous rounds of collective bargaining that have resulted in the establishment of a qualifying trust fund. After the initial round of collective bargaining, when a trust instrument memorializes agreement on factors that must be included for the trust to conform to the requirements of state and federal law, and the instrument itself forms a legal basis for the fiduciary duties of trustees, the only subject for negotiation may be the schedule of payments to be made. In that case, the terms of the existing trust may be incorporated by reference in the collective bargaining agreement. The same procedure may be followed in cases of initial collective bargaining, as here, by drafting and executing the trust agreement before the execution of the collective bargaining agreement.

The entirety of this approach assumes, of course, the creation of a fixed contribution plan rather than a fixed level of benefits plan. See Kirkland, Negotiation and Administration of Health and Welfare Programs, 80 Mo.Lab. Rev. 576–79 (1957). The appellants do not, at any rate, attempt to explain their view in light of the union representative's burden to go forward with the establishment of a qualifying trust fund that is set out in Section 302(c)(5).

**16.** See N.L.R.B. v. St. Louis Cordage Mills, 8 Cir. 1970, 424 F.2d 976, 980–81, n. 2: "We are at a loss to understand how monies can be paid into a fund which has failed to materialize. The Board seems to argue that the language of the section permits a distinction between 'the fund' and 'the welfare fund program as conceived'. We think that that interpretation stretches the clear import of the terms used . . . The language compels the conclusion that the welfare fund either exists or it does not; it has either met all prerequisites set forth in the contract or it has not." Although the facts in the present case are distinguishable because of the added contractual requirements in *St. Louis Cordage Mills*, the reasoning is equally applicable. When Snider notified the employers, on March 1, 1970, that no pension fund existed in fact, what was his legal justification for requiring continued payments into an escrow account?

First, an instrument may incorporate by reference only the terms of an instrument already in existence. Scott states this principle as it applies to the law of wills:

> In some states, it is held that an unattested instrument can be incorporated in a will by reference to it in the will, with the effect that it becomes a part of the will. This doctrine is rejected in many states; and in the states in which it is accepted it is essential that the unattested instrument should be in existence at the time of the execution of the will and should be referred to in the will as an existing document.

1 A. Scott, The Law of Trusts § 54.1, p. 362 (2d ed. 1956). Second, the chronology of the instruments renders that approach impossible. The collective bargaining agreement was signed in December 1968. The pension trust agreement, though never signed, is dated 1970. The health and welfare trust agreement is dated 3 February 1969. Neither instrument, therefore, could have been incorporated by reference into the collective bargaining agreement.

■ Other substantial obstacles exist. First, the collective bargaining agreement "anticipates" the creation of only a health and welfare fund; it does not even "anticipate" the creation of a pension trust fund that would conform to the requirements of Section 302(c)(5)(C). Second, the pension trust indenture in the record, which appears to be dated 6 October 1970, was not executed and was not signed by any of the defendants. Moreover, the appellants do not now contend, nor did they offer to prove in the district court, that the defendants ratified or assented to this particular agreement by making any payments that were consistent with its terms after the

apparent date on its face. Indeed, they maintain in their brief that the defendants made no pension fund contributions after March 1, 1970, the date that Snider informed participating employers of the non-existence of any lawful pension fund. Third, the health and welfare trust indenture was not signed by any of the defendants. That indenture specifically provides that it will be binding only among the union, signatory employers, "and such other employers who may hereafter become parties to this Agreement by executing the agreement to be bound by this Agreement".[17] The appellants did not produce, nor did they offer to produce, nor did they allege the existence, either in the district court or in this Court, of any such agreement signed by any of the defendants. See N. Levin, Labor-Management Benefit Funds 33–35 (1971).

■ In the face of this language, we do not think that the mere fact that some payments were made can supply the element of definiteness that Congress prescribed. As Justice Brennan noted, "[c]ommon practice cannot change the law and make into bargaining unit 'employees' those who are not". Allied Chemical and Alkali Workers v. Pittsburgh Plate Glass Co., 1971, 404 U.S. 157, 176, 92 S.Ct. 383, 30 L.Ed.2d 341, 356. Similarly, we are not at liberty to bind an employer to make payments that, if made voluntarily, would violate Section 302.[18]

Finally, Local 15 contends that the district court "may have attributed a controlling significance" to Moglia v. Geoghegan, 2 Cir. 1968, 403 F.2d 110. The facts of that case are distinguishable from those presented here. We find no evidence in the record, however, that the district court found *Moglia* "controlling"

---

17. In the proposed pension trust indenture, the binding effect of the instrument is not limited to the signatories, but is alleged to encompass "several individual employers . . . who are parties to a collective bargaining agreement."

18. Of course, this case is to be distinguished from Lewis v. Benedict Coal Corporation,

1960, 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442. In *Lewis*, the Court held that an employer may not assert a union's breach of other provisions of the collective bargaining agreement as justification for nonpayment of its trust fund contributions. In this case, the controversy goes to the validity of the trust provision itself.

or attributed improper significance to Judge Waterman's able discussion of the statutory history and intent.

The decision of the district court is affirmed.