**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION NO. 308 et al., Plaintiffs,**

v.

**DAVE'S ELECTRIC SERVICE, INC., Defendant.**

**No. 74–45–Civ–T–H.**

United States District Court,
M. D. Florida,
Tampa Division.

Oct. 8, 1974.

Ronald G. Meyer of Law Offices of Richard H. Frank, P.A., Tampa, Fla., for plaintiffs.

Allen M. Blake, V. James Facciolo, Marion E. Williams, Jr., of Alley, Rock & Dinkel, Chartered, Tampa, Fla., for defendant.

## OPINION

HODGES, District Judge.

On January 17, 1974, Plaintiffs initiated this action against the Defendant employer to recover delinquent contributions to the employees' health and welfare trust fund as required by the collective bargaining agreement between the union and the employer. Plaintiffs are Local 308 of the International Brotherhood of Electrical Workers (hereafter referred to as the Union) and the several trustees of that local's health and welfare fund (hereafter referred to as the Trustees). Jurisdiction in this Court is predicated on § 301(a) of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 185(a).

On February 25, Defendant filed its answer asserting the affirmative defense of failure to exhaust the grievance procedure, including arbitration, estab-

lished in the collective bargaining agreement. Defendant also counterclaimed against the Union seeking damages for alleged breaches of contract in connection with the employee referral system, the workmanship of employees, and the requirement that employees furnish personal tools and equipment. On March 6, Plaintiffs filed motions to dismiss the counterclaim, to strike portions of the counterclaim, and to strike the affirmative defense. A hearing on these motions was held on May 23.

## I. THE COLLECTIVE BAR-GAINING AGREEMENT

██ Since the law compels a party to submit his claim to arbitration only if he has contracted to do so, this analysis must begin by examining the terms of the pertinent collective bargaining agreement. Gateway Coal Co. v. U.M.W., 414 U.S. 368, 374, 94 S.Ct. 629, 635, 38 L.Ed.2d 583 (1974). The contract involved in this dispute is in fact composed of two agreements between the Union and the Pinellas County Electrical Contractors Association, Inc., of which the Defendant is a member. The first, entitled "Residential Agreement," was effective from September 1, 1972, to September 1, 1974, and presumably related to electrical work performed in residences. The second, entitled "Inside Working Agreement," is effective from December 1, 1972, to November 30, 1975, and apparently governs electrical work performed on construction and industrial jobs. While the pleadings do not clearly disclose whether only one or both of these agreements is applicable to the claims here, the implication is that only the Residential Agreement is involved. In any event, the grievance and arbitration provisions of both contracts are substantially similar and, for the purposes of the present motions, produce the same result.

██ The grievance procedure in each agreement contemplates initial adjustment by individual representatives of the Union and the employer. If a resolution cannot be made within 48 hours, the dispute is referred to a Labor Management Committee composed of three Union representatives and three employer representatives. Should no decision be reached by the Committee, the dispute is referred for adjudication to the Council on Industrial Relations for the Electrical Contracting Industry. The Residential Agreement provides that this procedure shall apply to "[a]ll grievances or questions in dispute concerning the application, interpretation, or performance of the terms of this Agreement." Residential Agreement, Art. I, § 6. The Inside Working Agreement provides simply that "[a]ll grievances or questions in dispute shall be adjudged" in accordance with this procedure. Inside Working Agreement, Art. I, § 5. Both agreements contain no-strike clauses. Thus, the Court concludes that the grievance and arbitration procedures of both agreements are broad enough to include the claims made here, arising as they do from the provisions of the agreements themselves. Accordingly, the Court has no difficulty in holding that it was the intent of the parties, as evidenced by the agreements, to process the disputes described in the counterclaim in accordance with the grievance and arbitration procedure. The claim of Defendant that Plaintiff Union breached the referral, workmanship, and tools provisions of the collective bargaining agreement is subject to the grievance procedure of the agreements and is not to be litigated here.

A more difficult question is posed with respect to the affirmative defense of failure to arbitrate the basic claim asserted in the complaint. Do the agreements require that the Trustees, as third party beneficiaries of the collective bargaining agreement, submit to arbitration their claim for delinquent health and welfare contributions?

## II. THE LAW OF COMMERCIAL THIRD PARTY BENEFICIARY CONTRACTS

██ The law with respect to the defenses available against a third party

beneficiary of an ordinary commercial contract seems to be that the beneficiary's rights are subject to any defenses that would be available to the promisor were he being sued on the same contract by his promisee. Restatement, Contracts § 140 (1932). That this is so seems clear since the claim of a beneficiary is dependent upon the relationship among the promisor, promisee, and beneficiary as established in the contract itself. Accordingly, the defenses of fraud, breach of condition whether express or constructive, mistake, or failure of consideration are valid against the beneficiary. His rights are no higher in this respect than those of the promisee since he has sacrificed nothing to secure those rights. Grismore, Contracts § 243 (Murray rev. ed. 1965). On the other hand, after the contract is made and that relationship is established, the rights of the promisee and those of the beneficiary follow separate paths so that intervening defenses may be good against one but not against the other. 4 Corbin, Contracts § 818 (1951). As a consequence, the defenses of discharge by the promisee and wrongful acts by the promisee subsequent to the making of the contract, for example, may not be asserted against the beneficiary. *Id.* The key to determining which defenses may be available against the beneficiary is the relationship among the parties as initially defined in the contract itself. It would seem, therefore, that the defense of failure to arbitrate raised by a promisor in a commercial third party beneficiary contract containing, at its inception, a broad arbitration clause would be good against the beneficiary. If an arbitration clause does not exclude the beneficiary, it must be concluded that, like the promisee, he takes subject to it. *Cf.* Lewis v. Benedict Coal Corp.,

361 U.S. 459, 468, 80 S.Ct. 489, 494–495, 4 L.Ed.2d 442 (1960).

### III. ARBITRATION AND THE NATIONAL LABOR LAW

The state of the law with respect to commercial third party beneficiary contracts is not necessarily controlling here, however, because of the command by Congress that the courts fashion from the policy of our national labor laws a body of federal law applicable to § 301 cases. Textile Workers Union v. Lincoln Mills of Ala., 353 U.S. 448, 456, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957). Insofar as arbitration is concerned, however, the Supreme Court, beginning with the *Steelworkers Trilogy* [1] and continuing through its recent decision in Gateway Coal Co. v. U. M.W., 414 U.S. 368, 94 S.Ct. 629, 38 L. Ed.2d 583 (1974), has time and again declared that federal policy encourages arbitrability of labor disputes, and that arbitrability is to be presumed.[2] In *Gateway Coal,* the Court emphasized that the national goal of industrial peace is the basis of this policy. Since a collective bargaining agreement cannot define every detail of a complex and ongoing labor-management relationship, arbitration is peculiarly suited to the establishment of a private common-law-of-the-shop while also providing the most efficient and expeditious means of resolving individual disputes by selection of impartial arbitrators having accumulated expertise related to the particular industry or issue involved. Accordingly, the Court in *Gateway Coal* applied the presumption of arbitrability to labor disputes touching the safety of employees. *Gateway Coal, supra,* at 378–379, 94 S.Ct. at 637.

While this rationale for arbitration—industrial peace—would seem

**1.** United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S. Ct. 1343, 4 L.Ed.2d 1403 (1960) ; United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) ; United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

**2.** For the leading decision of the National Labor Relations Board with respect to deference to arbitration, see Collyer Insulated Wire, 192 N.L.R.B. 837 (1971).

to have greater applicability to the traditional two party union-employer dispute than to the three party union-employer-trustees dispute involved here, the Supreme Court's explicit recognition of the expertise of the arbitrator would appear to be equally applicable. Disputes of the present variety typically require resolution of issues involving union or job jurisdiction and conducting an accounting. Obviously, a thorough knowledge of industry practices in these areas would be a benefit an arbitrator could bring to the parties that this Court could not. That expertise alone, as approved and recognized in the authorities, is sufficient to tip the scales in favor of arbitration insofar as the national labor policy is concerned.

In addition, the other considerations of expedition and efficiency suggest that arbitration is the more sensible method of dispute resolution in this context. In this Court the parties must comply with the Federal Rules of Civil Procedure and the local rules of the Court. Among other formal requirements of these rules, supporting and opposing legal memoranda are required with motions.[3] The parties must labor, as well, under the handicap of a crowded docket.[4] Hearings are difficult to obtain, and trials, even when scheduled far in advance, are frequently continued as a matter of court necessity.[5] This case itself is an excellent illustration of the delays caused by crowded docket conditions. This complaint was filed in January, 1974, yet motions to dismiss are just now being resolved. Accordingly, the parties can relieve themselves of the burden of delay by arbitrating their dispute. In short, arbitration is a simpler and more expeditious method than is litigation, and it was specifically denominated in the contract as the procedure to be employed in the event of disagreement.

In reaching this result, the Court receives solace from the knowledge that arbitration is not inconsistent with the actual practice of parties engaged in disputes of this kind.[6] In addition, the Court notes that § 302(c)(5)(B) of the Act, 29 U.S.C. § 186(c)(5)(B), specifically requires the arbitration of certain disputes concerning internal trust fund management. While these provisions do not compel the Court to infer a Congressional intent that this dispute be arbitrable, they are helpful in illustrating the Congressional intent that arbitration

---

3. Rule 8, Rules of the United States District Court for the Middle District of Florida.

4. There were 1,625 civil cases pending in this District on July 1, 1973. On December 31, 1973, the number had risen to 1,800, an increase of 175 cases in six months time. Director of the Administrative Office of the United States Courts, Semi-Annual Report A-6 (1974). Omitting land condemnation cases, of the 1,787 civil cases pending on December 31, 1973, 1,205 had been pending for less than one year; 414 for 1 to 2 years; 103 for 2 to 3 years; and 65, or 3.6 percent of the total, for 3 years and over. *Id.* at A-26. In the Tampa Division, staffed by only two judges, there have been 588 civil actions filed to date in this calendar year alone. Of course, these figures do not include the number of criminal cases which take almost half of a district judge's time. See also Judd, The Expanding Jurisdiction of the Federal Courts, 60 A.B.A.J. 938 (Aug. 1974).

5. One example, though extreme, is particularly relevant. The complaints in three related § 301 actions to recover delinquent health and welfare contributions were filed on July 31, 1972. Godden, et al. v. Ramos, d/b/a Suncoast Tile of Tampa, et al., Case Numbers 72–433–Civ–T–H, 72–434–Civ–T–H, and 72–435–Civ–T–H. Certain affirmative defenses, involving alleged violations of § 302(c)(5)(B) of the Act, 29 U.S.C. § 186(c)(5)(B), were tried and determined on March 22, 1973. Thereafter, certain motions were decided, and trial was scheduled for February, 1974. For various reasons, unrelated to the parties but required as a matter of court administration, trial was rescheduled, first, for March; second, for August; third, for October; and last, for September, 1974.

6. For examples of arbitrations of claims for delinquent health and welfare contributions, see Nicholson Cleveland Terminal Co., 51 L.A. 837 (1968); Park-Pitt Building Co., 47 L.A. 234 (1966); Ulene v. Jacobson, 209 Cal.App.2d 139, 26 Cal.Rptr. 257 (1962).

should play an important role in labor-management relations. *Cf. Gateway Coal, supra.*

## IV. THE EFFECT OF LEWIS v. BENEDICT COAL CORP.

It is argued by Plaintiffs that Lewis v. Benedict Coal Corp., 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960), compels rejection of the defense of failure to arbitrate. The few reported decisions on point (arising in two District Courts) cite *Lewis* for the proposition that the failure of an employer to make contributions as required by an agreement is not an arbitrable dispute in the absence of a specific provision in the agreement requiring the Trustees to submit their claims to the arbitration procedure. Wishnick v. One Stop Food & Liquor, Inc., 359 F.Supp. 239, 242–243 (N.D.Ill. 1973); Owen v. One Stop Food & Liquor Store, Inc., 359 F.Supp. 243, 246–247 (N.D.Ill.1973); Boyle v. North Atlantic Coal Corp., 331 F.Supp. 1107, 1108 (W.D.Pa.1971).[7] However, these authorities do not seem to consider the issue at length, and this Court must respectfully disagree that *Lewis* supports that conclusion.

*Lewis* was an action by trustees of a welfare fund against a mine owner to recover royalties allegedly due under the applicable collective bargaining agreement. The mine owner defended by claiming that its obligation to the trustees was excused when the union violated the no-strike provisions of the agreement. In addition, the mine owner counterclaimed against the union for damages sustained as a result of strikes and work stoppages. The District Court, upon a jury verdict, entered judgment in favor of the mine owner on its counterclaim against the union and in favor of the trustees for the royalties due, but effect was given to the mine owner's defense by ordering that the judgment in favor of the trustees be satisfied only out of the moneys due the mine owner on the judgment against the union. The Court of Appeals affirmed in substantial part. Dividing 4 to 4, the Supreme Court affirmed the judgment in favor of the mine owner against the union for damages arising from the strikes and work stoppages. Dividing 7 to 1, however, the Court reversed the lower courts on the issue of whether the mine owner might assert the union's breaches as a defense to the trustees' suit. It held that the mine owner could not assert such a defense.

In reaching this result the Court recognized that, in the context of a commercial third party beneficiary contract, the promisor might assert the promisee's breaches in a suit by the beneficiary. 361 U.S. at 467–468, 80 S.Ct. at 494–495. However, for four basic reasons, each related to the peculiar nature of a collective bargaining agreement, the Court would not draw such an inference from the agreement at issue finding no "unequivocal words" expressing that intention. The Court's four reasons were:

1. Without explicit language, it could not be assumed that the parties intended the mine owner to set off its damages against its royalty obligation because the mine owner, as much as the union, had a real interest in the soundness of the welfare fund since employers often undertake the obligation of providing security for employees and their families. 361 U.S. at 468–469, 80 S.Ct. at 495.

2. In view of the industry-wide nature of the agreement and, correspondingly, the fund, allowing one owner to curtail royalties to the fund would re-

7. Lewis v. Harcliff Coal Co., Civil Action Number 63–879 (W.D.Pa.1964), an unreported opinion, is cited in *Wishnick, Owen* and *Boyle* as additional authority for the result reached. In addition, the following cases discuss the arbitrability issue without citing Lewis v. Benedict Coal Co.: L. A. Concrete Pumping, Inc. v. Majich, 84 L.R.R.M. 2656 (C.D.Calif.1973) [not arbitrable, but dependent upon specific contract language]; U. S. Trucking Corp. v. Frank, 70 L.R.R.M. 2240 (N.Y.Sup.Ct.1968) [arbitrable; List Industries Corp. v. Gelber, 11 Misc.2d 735, 175 N.Y.S.2d 800, 34 L.C. ¶ 71,518 (N.Y. Sup.Ct.1958) [not arbitrable].

quire other owners to pay higher royalties to make up the difference. Absent explicit language, the Court would not interpret the contract so as to cause these collateral effects. 361 U.S. at 469, 80 S.Ct. at 495.

3. The Court would not assume the intent that the trustees' claim was subject to offset since the mine owners contracted, among other things, to pay certain wages to the employees, yet no one would contend that the owner could recoup damages inflicted by the union through deductions from the employees' contractual wages. *Id.*

4. The language of § 301(b) of the Act, 29 U.S.C. § 185(b),[8] evidences a congressional intent that the union, as an entity, be the sole source of recovery for injury inflicted by it. Since this national labor policy seeks to protect individual union members from the actionable wrongs of their union, it would also seek to protect the interests of the beneficiaries of the welfare fund—the employees—by prohibiting this kind of defense. 361 U.S. at 470, 80 S.Ct. at 495–496.

Thus, the reasons offered by the Court in *Lewis* for rejecting the use of a *substantive* defense or counterclaim in an action by the trustees are not at all applicable to the situation posed here —the use of the *procedural* defense of arbitration. Absent a clear showing of intent to the contrary, the *Lewis* Court would not assume the parties intended to allow certain union action to subvert the trustees' substantial rights under the agreement. Requiring arbitration, of course, will not subvert any rights. It will merely change the initial forum in which those rights are determined to the preferred forum as a matter of national labor policy and the selected forum by the terms of the agreement itself. The trustees will still have all substantive rights to which they are entitled under the collective bargaining agreement. This is not to say, however, that the Court disclaims its obvious jurisdiction under § 301 of the Act—jurisdiction created by Congress as a part of that same national policy. Rather, the Court will retain jurisdiction and merely stay its hand while the parties first pursue the procedural remedy ordained by the contract.[9]

A separate order will be entered disposing of the pending motions in keeping with the views expressed herein.

---

8. Section 301(b) provides that "[a]ny money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets."

9. It should also be noted that failure to arbitrate is normally asserted in the nature of an affirmative defense pursuant to Rule 8(c), F.R.Civ.P., and may be waived if not so alleged. See 2A Moore, Federal Practice ¶ 12.23 at 2455 (2d ed. 1974). This Court's experience has been that in many of these cases the trustees are merely seeking to reduce their claim to judgment and a default is entered against the defendant employer. The decision in this instance will have no affect upon cases of that kind.