**Forrest BUGHER, et al.,**
**Plaintiff-Appellee,**

v.

**CONSOLIDATED X–RAY SERVICE**
**CORPORATION,**
**Defendant-Appellant.**

**No. 81–1349.**

United States Court of Appeals,
Fifth Circuit.

May 31, 1983.

Rehearing and Rehearing En Banc
Denied Aug. 12, 1983.

Locke, Purnell, Boren, Laney & Neely, Larry M. Lesh, Schoolfield, Smith & Weissert, Hugh Montgomery Smith, Dallas, Tex., for defendant-appellant.

William N. Wheat, Fort Worth, Tex., Michael A. Crabtree, Washington, D.C., for plaintiff-appellee.

Before BROWN, RANDALL and TATE, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This case arises under § 301 of the National Labor Relations Act (NLRA), 29 U.S.C. § 185, and § 502 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132. Allied as plaintiffs and appellees are Local Number 2 of the International Union of Operating Engineers (Union), the Trustees of the Union's Central Pension Fund (Pension Trustees)[1], and the Trustees of the Health and Welfare Fund of Local Number 2 (Welfare Trustees)[2]. The Trustees and the Union filed suit in federal district court, alleging that Consolidated X-Ray Service (Consolidated) had deliberately failed to contribute to the Funds and to deduct union working dues in the amounts agreed to under collective bargain-

---

[1] The Pension Trustees are Forrest Bugher, Richard Wren, Reese Hammond, J.A. McMahon, A.W. McIntyre, Hailey Roberts, John E. Cullerton, and Richard E. Dennis.

[2] The Welfare Trustees are Carl B. Pratt, Vergil Belfi, John Faust and Harold B. Huhn.

ing agreements. Consolidated replied with a battery of affirmative defenses, but to no avail, as the district court, after trial, held in favor of the Trustees and the Union.[3]

Consolidated contends on appeal that the district court erred (i) in concluding that the Trustees and the Union were not required to exhaust the grievance and arbitration provisions of the collective bargaining agreements, (ii) in finding that Consolidated had an enforceable obligation to contribute to the Pension and Welfare Funds, and (iii) in awarding attorneys' fees to the plaintiffs and in awarding interest of 10% compounded annually. As we find no error, we affirm the judgment of the district court.

Consolidated is in the business of "nondestructive testing"—the use of radiography and other methods to determine the strength and integrity of welds and metallic structures. In 1971, 1974, and 1977, it signed collective bargaining agreements with the Union, the coverage of which is more narrowly defined with each succeeding agreement. Each agreement, however, covers "all employees" engaged in "field non-destructive testing" for Consolidated, with certain categories of employees excluded under the later contracts.[4]

Each collective bargaining agreement required Consolidated to contribute to the Pension and Welfare Funds in specified amounts for each covered employee. The agreements also required Consolidated to deduct Union working dues for each employee and remit those to the Union.[5]

In 1976, the Trustees and the Union conducted an audit of Consolidated's payroll books and records. In July of that year, they filed this suit. The Trustees sought recovery of delinquent fund contributions of $104,312.33. The Union sought recovery of delinquent working dues in the amount of $7,371.27. These figures were based upon the results of the audit, which covered the period from February 20, 1971 through December, 1975. The Trustees and the Union also requested attorneys' fees, audit expenses, interest, and a supplemental audit to determine the amount of any additional delinquency which had accrued since January, 1976.

Consolidated initiated a rebuttal audit, which uncovered a delinquency of only $143.00, which had been more than offset by contributions made since December, 1975. The parties agree as to the reason for the huge discrepancy between the re-

3. *Bugher v. Consolidated X-Ray Service Corporation*, 515 F.Supp. 1180 (N.D.Tex.1981).

4. The 1971 agreement provides:
 This Agreement shall apply to and cover all employees engaged in field nondestructive testing.
 The 1974 agreement provides:
 This Agreement shall apply to and cover all employees engaged in field nondestructive testing, excluding Alaska, Nuclear Power Plants and visual inspection.
 The 1977 agreement provides:
 This Agreement shall apply to and cover all employees engaged in field pipeline or pipeline-related non-destructive testing including all employees who furnish rigs and equipment in the performance of services; excluding Alaska, Nuclear Power Plants, laboratory work and that work considered in the industry as "City" or "call-out" work; and the Company recognizes the Union as the exclusive bargaining agent for all such employees.

5. The successive collective bargaining agreements called for contributions by Consolidated in the following amounts:

*Central Pension Fund:* Effective February 17, 1971, 15 cents per hour for each hour worked by bargaining unit employees employed more than 31 days, that figure to increase to 20 cents per hour as of February 17, 1973. In 1974 the language was changed somewhat and payment set at 30 cents per hour, increasing to 40 cents per hour in 1975, 50 cents per hour in 1976, and remaining at that level through the end of the 1977–1980 contract.

*Welfare Fund:* Effective April 1, 1971, $31.00 per month for each month or major part thereof worked by bargaining unit employees employed more than 31 days. In 1974, the amount was changed to $42.00 per month, rising to $47.00 per month in 1975. In 1977, the rate and manner of payment was changed to 45 cents per hour for covered employees, up to a maximum of 40 hours, with the amount increasing to 50 cents per hour in 1978.

*Union Working Dues:* As of February 17, 1971, dues were to be deducted and remitted to the Union at the rate of 10 cents per hour worked, increasing to 15 cents per hour in 1972. The rate of 15 cents per hour was maintained through the 1974 and 1977 agreements.

sults of the two audits. Consolidated did not contribute for non-Union employees or for Union employees who were not engaged in cross-country pipeline jobs, claiming that the contribution requirements of the agreements did not apply to such employees. The Union and the Trustees claim to the contrary.

Consolidated advanced this defense at trial. It also claimed that because this was a disagreement about the true meaning of the coverage clause, the agreements' arbitration and grievance provisions should have been invoked. By failing to do so, Consolidated argued, the Trustees and the Union had waived their claims.

The district court ruled against these and other affirmative defenses raised by Consolidated,[6] and rendered judgment in favor of the various plaintiffs. It awarded attorneys' fees, audit expenses and interest to the plaintiffs and ordered Consolidated to submit to a further supplementary audit.[7] From this judgment Consolidated appeals.

6. None of the several other affirmative defenses posed by Consolidated at trial have been raised before this court.

7. The court ordered payment to the plaintiffs in the following amounts:

Pension Fund ($63,114.33, less $3,272.40 credit)
Pension Fund .................... $59,841.93
Welfare Fund .................... $41,198.00
Working Dues ................... $ 7,371.27
Audit Expenses ................. $11,554.66
Attorney's Fees ................ $39,375.00

8. The collective bargaining agreement states:
 ARTICLE XIV
 *Adjustment of Disputes and Arbitration*
 (1) Definition: For the purposes of this Agreement, a "grievance" shall mean a dispute arising between the parties to this Agreement or between any employee or employees covered by this Agreement and the Company as limited to or by the terms and conditions of this Agreement,
 \* \* \* \* \* \*
 (4) Grievances or disputes as defined in this Article shall be handled in the following manner:
 (a) Employees shall take up any grievance with their immediate supervisor within seventy-two (72) hours of the occurrence.
 (b) If the grievance cannot be resolved, employee shall reduce the grievance to writing and forward one (1) copy to the Union

## I. Bound to Arbitrate?

### The Pension and Welfare Trustees

The collective bargaining agreements set forth grievance and arbitration procedures to be followed in resolving certain disputes arising under those agreements. Under those procedures, an individual employee is required first to take his complaint to his immediate supervisor. If the grievance is not thereby resolved, it must be reduced to writing and forwarded to the Union and the Company, which must attempt to resolve it. If they fail to do so, the grievance must be referred to the top officials of the Union and the Company. If those officials cannot reach an agreement, the problem may then, and only then, be submitted to arbitration. Grievances initiated by the Union itself are subject to this process, although the first step is omitted.

Under the contract, failure to meet specified time limits works a forfeiture of the grievance. The Union retains final authority to proceed with a dispute or to decline to do so.[8]

and one (1) copy to the Company. The Company and the Union are required to attempt to resolve the grievance within five (5) days after step one (1) has been completed. If the grievance cannot be resolved at this step, the grievance will be referred to the top officials of the Company and the Union within ten (10) days thereafter. Grievances initiated by the Union shall be commenced as set out above in Step two except for the first sentence.
 (c) If the grievance cannot be settled at the second step, the grievance may be submitted to arbitration within thirty (30) days.
(5) Failure of either party to comply with the time limits set forth above will serve to declare the grievance forfeit against the defaulting party. The time limits set forth above may be extended only by written mutual agreement.
At any step in the foregoing grievance, the authorized official of the Union shall have the final authority with respect to any aggrieved employee covered by this Agreement to decline to process the grievance further if, in the judgment of such officials, the grievance lacks merit or lacks jurisdiction under the terms of this Agreement or has been adjusted or justified under the terms of this Agreement to the satisfaction of the Union.

■ Consolidated claims that the question of whether particular employees are covered by the agreement is a dispute which invokes the grievance and arbitration procedures. Although the district court recognized that "[t]he differences between the two audits are essentially based on differing interpretations of the coverage clauses of the Collective Bargaining Agreements," *Bugher v. Consolidated X-Ray Service Corp.*, 515 F.Supp. 1180, 1184 (N.D.Tex. 1981), it concluded that the Trustees could not be required to exhaust the grievance and arbitration procedures, as the collective bargaining agreements contain no provision specifically requiring the funds to do so and "without specific provision in a collective bargaining agreement, welfare and pension funds should not be compelled to arbitrate their grievances with employers." [footnote omitted] 515 F.Supp. at 1182.

We agree with the district court that the Trustees cannot be required to exhaust the grievance and arbitration procedures set forth in this collective bargaining agreement.

This agreement defines a "grievance" as "a dispute arising *between the parties* to this Agreement or between any employee or employees covered by this Agreement and the Company...." [emphasis added]. As the trial court correctly held, "[t]he two Plaintiff Funds are not parties to the collective bargaining agreements."[9] 515 F.Supp. at 1182. Nor are they employees covered by the agreements. The dispute between the Trustees and Consolidated is not a dispute "between the parties" and therefore is not covered by the grievance and arbitration provisions of the contracts.

In reply to this argument, Consolidated cites *Central States, Southeast and Southwest Areas Pension Fund v. Howard Martin, Inc.*, 625 F.2d 171 (7th Cir.1980), in which the plaintiff trustees' collection suit was held to have properly been dismissed on the grounds that the trustees were required to exhaust contractually mandated arbitration provisions. *Howard Martin* is not to the point, however. The decision in *Howard Martin* was founded upon article 8 of that particular contract, "which requires that all grievances or questions of interpretation be referred to arbitration before legal action is commenced.... [T]he existence of the obligation to make certain payments depends upon interpretation of the contract and the contract specifically requires arbitration on questions of interpretation." 625 F.2d at 172. This contract contains no such provision. Moreover, nothing in *Howard Martin* indicates that the grievance and arbitration procedure was specifically reserved, by definition, for disputes "between the parties," as it is here. Here the Trustees are not parties. The disagreement between Consolidated and them over the meaning of the coverage clause is not a grievance and need not be funneled through arbitration.

In addition, both the Pension Trust Fund instrument and the Health and Welfare Trust Fund instrument (as amended in 1975) authorize the Trustees to go directly to court to pursue delinquent employer contributions. The Pension Fund instrument provides,

Section 4. DEFAULT IN PAYMENT. Nonpayment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payments. In addition to any other remedies to which the parties may be entitled, an Employer in default for ten working days may be required at the discretion of the Trustees to pay such reasonable rate of interest as the Trustees may fix on the monies due to the Trustees from the date when the payment was due to the date when payment is made, together with all expenses of collection incurred by the Trustees. The Trustees may take any

---

ARTICLE XV
*Grievance Procedure*
(1) Any grievance that cannot be settled between the employees, the Union or the Company in accordance with the provisions of the

foregoing Article and sections may be submitted to an independent arbitrator....

9. Consolidated does not dispute this finding, nor could it, as the funds neither negotiated nor signed the collective bargaining agreements.

action necessary enforce payment of the contributions due hereunder, including, but not limited to, proceedings at law and in equity.

The Health and Welfare Fund instrument provides,

3. 13 *Delinquency*. The Trustees shall notify an Employer, in writing, who is a party to this Trust agreement and who becomes delinquent in his payments, of the fact that said delinquency exists. In the event that any payment due from an Employer is delinquent and the Employer, after having been notified as hereinabove provided, continues to maintain its delinquency, the Trustees may, at their discretion, bring suit for collection of all amounts due and owing and if suit is brought, the Employer shall be liable, in addition to its delinquency, for Court costs, reasonable attorneys fees and liquidated damages in the amount of ten percent (10%) of the delinquent amount.

Neither instrument requires the Trustees to follow the collective bargaining agreements' grievance and arbitration procedures before taking legal action, nor has either group of Trustees agreed to do so.

■ In *Bricklayers, Masons and Plasterers International Union of America, Local Union No. 15 v. Stuart Plastering Co., Inc.,* 512 F.2d 1017 (5th Cir.1975), moreover, we stated plainly that in passing § 302 of the NLRA, Congress intended to make certain that employee fringe benefit funds were independent of union control. Congress acted "to remove [employee fringe benefit] funds from the absolute control of union officials by giving employers a coordinate responsibility for their administration." 512 F.2d at 1024. The statute flatly prohibits an employer from making payments to employee representatives, with certain clearly elucidated, strictly construed exceptions.[10] One of these exceptions is for qualified trust funds which conform with the Act's requirements.[11] To bind the Trustees

---

10. **§ 186. Restrictions on financial transactions**

**Payment or lending, etc., of money by employer or agent to employees, representatives, or labor organizations**

(a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; or

(3) to any employee or group or committee of employees of such employer employed in an industry affecting commerce in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or

(4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as

such officer or employee of such labor organization.

**Request, demand, etc., for money or other thing of value**

(b)(1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.

\*　　\*　　\*　　\*　　\*　　\*

(d) Any person who willfully violates any of the provisions of this section shall, upon conviction thereof, be guilty of a misdemeanor and be subject to a fine of not more than $10,000 or to imprisonment for not more than one year, or both.

11. § 186

\*　　\*　　\*　　\*　　\*　　\*

**Exceptions**

(c) The provisions of this section shall not be applicable

\*　　\*　　\*　　\*　　\*　　\*

(5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): *Provided,* That (A) such payments are held in trust for the purpose of

to the arbitration provisions of this contract would violate Congress' intent. To compel the Trustees to follow those procedures would place the Union in control of whether payment should in fact be demanded, in what amount, and from which employers. By carelessness or deliberate refusal to act, the Union could completely thwart the Trustees' ability to administer and ensure payments to the trust funds. Though in full possession of their fiduciary duties, the Trustees could exercise their fiduciary powers only at the Union's discretion. Such a situation would completely violate the Congressional directive that control of fringe benefit funds shall not rest with the unions.

Recently, in *Robbins v. Prosser's Moving & Storage*, 700 F.2d 434 (8th Cir.1983) (en banc), the Eighth Circuit followed that reasoning to conclude that a group of fringe benefit fund trustees were not bound by the arbitration provisions of a collective bargaining agreement. In reaching that decision, the court expressed skepticism that unions will necessarily readily act in the best interests of fringe benefit funds, pointing to a number of respects in which the union's and the funds' interests might diverge. The court agreed that "the union and a pension fund are both fiduciaries." But they represent groups and interests that only partly coincide. We conclude

that the national pension policy . . ., and the rights of plan beneficiaries, can be vindicated as Congress seems to have intended only if trustees are given a direct right of access to the courts.

700 F.2d at 442.

The Eighth Circuit rejected the contrary view of the Seventh Circuit, expressed in *Howard Martin*. In *Howard Martin*, a panel of the Seventh Circuit stated,

Lastly the Funds say they have no access to the arbitration process because Article 7 of the contract provides that arbitration may be invoked "only by the authorized Union representative or by the employer." The argument falls of its own weight, however. To trigger the arbitration process, the Funds need only inform the Union, the members of which the Funds exist to serve, that Martin disputes the coverage of certain workers and ask the Union, the organization of primary interest, to file a grievance against Martin. [Footnote omitted]

625 F.2d at 173.

We find the Eighth Circuit's analysis more persuasive. To compel the Trustees to follow the contractually mandated arbitration procedures would expose the Funds to union control.[12]

paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree on an impartial umpire to decide such dispute, or in event of their failure to agree within a reasonable length of time, an impar-

tial umpire to decide such dispute shall, on petition of either group, be appointed by the district court of the United States for the district where the trust fund has its principal office, and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons at the principal office of the trust fund and at such other places as may be designated in such written agreement; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities.

12. Several other courts have considered whether fringe benefit fund trustees must submit claims for delinquent employer contributions to contractually set forth arbitration procedures.

Courts have held, as we do here, that the Trustees need not exhaust grievance and arbitration procedures, in *Burke v. Adams and Ells*

We uphold the district court's decision on this issue, then, for three reasons. First, the Trustees are not parties to the agreements and therefore their dispute with Consolidated is not a "grievance" as defined by the contracts. Second, both the Pension and the Health and Welfare Fund instruments clearly authorize the Trustees to file suit to collect delinquent employer contributions. Neither group of Trustees has agreed instead to submit such claims to arbitration. Finally, to impose these arbitration procedures upon the Trustees would undermine the vitally important independence of the Pension and Welfare Funds.

### The Union

■ The Union, in its suit for delinquent union working dues, is in an altogether different legal posture. It is undisputed that the Union, unlike the Trustees, is a party to the agreement. Moreover, the policies which inform § 186(c) and ERISA with regard to the protection and independence of trust funds simply do not apply to the Union's cause of action. Therefore, its dispute with Consolidated over the meaning of the coverage clause is at least an arguable grievance. We find, however, that the Union's claim need not have been referred to arbitration.

As did the district court, we reach this conclusion by examining the express provisions of the collective bargaining agreements. Although they outline grievance and arbitration procedures, they also authorize direct legal action by the Union to redress the company's deliberate failure to remit union working dues.

The deliberate failure or refusal by an employer to make deduction and/or remittance of dues as herein provided, following approval by the membership and upon appropriate authorization shall constitute a gross breach of contract in con-

---

of Ells, Inc., 603 F.2d 114 (9th Cir.1979); Trustees of National Benefit Fund for Hospital and Health Care Employees v. Constant Care Community Health Center, Inc., 669 F.2d 213 (4th Cir.1982); Wishnick v. One Stop Food & Liquor Store, Inc., 359 F.Supp. 239 (N.D.Ill.1973); Owen v. One Stop Food & Liquor Store, Inc., 359 F.Supp. 243 (N.D.Ill.1973); Todd v. Casemakers, Inc., 425 F.Supp. 1375 (N.D.Ill.1977); Central States, Southwest and Southeast Areas Pension Fund v. Gratiot Central Oil & Gas Service, Inc., 517 F.Supp. 811 (W.D.Mich.1981); O'Hare v. General Marine Transport Corp., 534 F.Supp. 120 (S.D.N.Y.1981); and Resilient Floor Decorators Insurance Fund v. Hay's Installation, Inc., 532 F.Supp. 829 (E.D.Mich. 1982). In Adams and Ells, the Ninth Circuit held that the fringe benefit fund trustees could not be compelled to arbitrate a dispute over delinquent contributions because the employer had never requested arbitration. The court explicitly did not decide "whether the district court can never compel non-signatory trustees of an employee benefit fund to arbitrate an alleged deficiency in contributions required by the collective bargaining agreement." 603 F.2d at 115. Likewise, in Constant Care, the Fourth Circuit found no need to decide that question. It held instead that since there was no dispute over whether contributions were owed, there was nothing for the arbitrator to decide, and arbitration could therefore not be compelled. Wishnick and Owen relied upon 29 U.S.C. § 186(c) in concluding that the trustees could not be compelled to arbitrate their claim for delinquent contributions:

Further, Congress, in enacting § 302 of the Labor Management Relations Act (29 U.S.C. § 186) intended that Welfare and Pension Funds established in accordance with that section would be independent of exclusive control by the union. Consequently, the failure of an employer to make contributions as required by an agreement is not an arbitrable dispute in the absence of a specific provision in the agreement requiring the Trustees to submit their claims to the arbitration procedure.

359 F.Supp. at 243, 359 F.Supp. at 246.

The holding and rationale of Wishnick were cited with approval in Casemakers, Gratiot Central Oil & Gas Service, and General Marine Transport Corp.. They were cited disapprovingly in Resilient Floor, in which specific provisions of the collective bargaining agreement allowed the Trustees to file suit for delinquent contributions without having to resort to arbitration.

Trustees were compelled to submit to arbitration in Farmer v. Fisher, 586 F.2d 1226 (8th Cir.1978); Layne-Western Co., Inc. v. International Union of Operating Engineers, AFL–CIO, Local Union No. 513, 650 F.2d 155 (8th Cir. 1981); and IBEW, Local Union No. 308 v. Dave's Electric Service, Inc., 382 F.Supp. 427 (M.D.Fla.1974). Although generally in accord with the position taken by the Seventh Circuit in Howard Martin, none of these cases considered the implications of Union control over the Trustees' access to the arbitration process. Farmer and Layne-Western were overruled by the Eighth Circuit in Rollins, supra.

sequence of which the Union may take appropriate economic and/or legal sanctions.

It is true that arbitration is generally favored as a matter of federal labor policy. The Steelworkers Trilogy, *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). *See also Nodle Brothers, Inc. v. Local No. 358*, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977). Nor is arbitration defeated by the fact that the meaning of a disputed clause seems "clear and unambiguous." *See Bugher*, 515 F.Supp. at 1184. "The collective agreement calls for the submission of grievances in the categories which it describes, irrespective of whether a court may deem them to be meritorious." *American Manufacturing*, 363 U.S. at 567, 80 S.Ct. at 1346, 4 L.Ed.2d at 1406.

■ As Justice Douglas pointed out in *Warrior & Gulf Navigation Co.*, 363 U.S. at 582, 80 S.Ct. at 1353, 4 L.Ed.2d at 1417, however, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." We are convinced by the contractual language that the Union has not agreed to arbitrate its claims for delinquent working dues, regardless of whether Consolidated contends that its refusal to contribute is in some way justified.

It is disingenuous to argue, as Consolidated does, that the clause which allows the Union to take legal action to collect unpaid working dues was meant to apply only to undisputed, acknowledged delinquencies. If that were the case, the clause would mean nothing, as the Company could always assert some reason, however specious, to justify its nonpayment. If a delinquency were truly undisputed, moreover, one assumes that legal action would not be necessary at all.

The district court correctly held that the Union was not compelled to arbitrate this particular issue.

## II. *Enforceable Obligation to Contribute?*

Consolidated argues also that the Trustees failed to prove the existence of written trust fund instruments which conform to the stringent requirements of § 186.[13] It contends that the plaintiffs must prove the existence of such instruments in order to establish an enforceable obligation to contribute to the funds.[14] Consolidated claims, therefore, that the evidence at trial was insufficient to support the trial court's finding of an enforceable obligation to contribute on Consolidated's part.

In claiming that the Trustees failed to shoulder their evidentiary burden, Consoli-

---

13. The requirements for a qualified trust fund, set forth in § 186(c)(5) are concisely summarized in *Stuart Plastering*.

> Section 302(c)(5), on the other hand, specifically requires that employee payments must not only be held in trust, but that "the detailed basis on which such payments are to be made" must be "specified in a written agreement with the employer." Moreover, the written agreement must provide a mechanism for resolving possible disputes between the employee representative trustees and their employer counterparts. The written agreement must also provide for an annual audit of the trust fund. Finally, under § 302(d), payments earmarked for pension benefits must be segregated from payments intended for any other proper purpose, and a separate trust fund must be established for the purpose of safeguarding pension benefits.

512 F.2d at 1026.

14. The Health and Welfare Trust Fund instrument was not presented as evidence in the district court, although 1975 amendments to the instrument were. While the Pension Trust Fund instrument does appear in the record, Consolidated claims that it is in several ways inadequate to fulfill the standards of § 186(c)(5). Specifically, Consolidated argues that its Pension Fund participating agreement has expired. It also contends that the Pension Fund instrument, by providing for the payment of trustees' expenses, does not properly segregate funds, and that the instrument allows the Union to control the fund by empowering the Union president to remove and replace Union-appointed Trustees.

dated relies upon language from *Stuart Plastering:* " . . . [T]he burden of establishing a qualifying trust fund must be met by the employee organization representative." 512 F.2d at 1026. According to Consolidated, this language requires the Union and the Trustees to establish the funds' compliance with all aspects of § 186(c) as a prima facie element of a collection suit. Failure to do so destroys the cause of action.

By taking this phrase out of context, Consolidated has utterly misconstrued its meaning. In that portion of *Stuart Plastering,* we were discussing the Union's obligation to set up the trust fund in conformance with statutory requirements. By no stretch of the legal imagination were we referring to the Union's evidentiary burden of proof in establishing its claim in a court of law.

*Stuart Plastering* is readily and easily distinguishable from this case. In *Stuart Plastering,* the plaintiffs admitted that there was no written trust fund agreement. The trust fund plainly did not conform to the letter of § 186(c). More importantly for our case, that nonconformity was raised and argued before the district court.

 The courts will not enforce an illegal collective bargaining agreement provision which obligates an employer to contribute to a fund which does not strictly meet § 186(c)(5)'s requirements. Any such alleged illegality, however, must be raised before the district court. F.R.Civ.P. 8(c) provides, in pertinent part,

Affirmative Defenses. In pleading to a preceding pleading, a party shall set forth

affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense.

Although phrased in the language of insufficiency of evidence, Consolidated's complaint about the adequacy of the trust fund instruments is in fact a claim that under § 186 the collective bargaining agreements are illegal and hence unenforceable. Yet Consolidated did not question the legality of the agreements' contribution provisions in the district court. We decline to consider that issue now for the first time, on appeal.[15]

### Attorneys Fees

The trial court awarded the plaintiffs attorneys' fees of $39,375, stating,

Plaintiffs have prayed for attorneys' fees and other costs. The court concludes that under 29 U.S.C. § 1132(g) and its equitable powers, that it can, and it should, award the attorneys' fees, interest and costs, including auditors' fees, requested by the plaintiffs and stipulated to be reasonable by the defendant in full.

515 F.Supp. at 1185.

Consolidated questions that award. It claims that § 1132(g) (§ 502 of ERISA)[16]

---

**15.** If in fact the funds did not conform to § 186(c)(5)'s requirements, Consolidated would be subject to criminal penalties under 29 U.S.C. § 186(d) for those contributions which it has made. Consolidated has not chosen to explore in detail this possible ramification of its argument.

**16.** At the time of trial, in 1979, 29 U.S.C. § 1132(g) provided:

**Attorney's fees and costs**

(g) In any action under this subchapter by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

As amended in 1980, it provides:

**Attorney's fees and costs; awards in actions involving delinquent contributions**

(g)(1) In any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

(2) In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan—

(A) the unpaid contributions,

(B) interest on the unpaid contributions,

(C) an amount equal to the greater of—

(i) interest on the unpaid contributions, or

**1436**

does not warrant the recovery of attorneys' fees because ERISA's standards do not govern acts or omissions which occurred before January 1, 1975. 29 U.S.C. § 1144.[17] Consolidated argues that the bulk of the delinquency awarded to the Trustees arose before that date and that the plaintiffs cannot be awarded fees and costs incurred in pursuing those particular pre-1975 claims. Consolidated does not question ERISA jurisdiction in this case nor does it question the fact that attorneys' fees are awardable under ERISA.

We reject Consolidated's argument that ERISA does not justify the award of attorneys' fees to the Trustees in this case. Section 1132(g) provides for an award of attorneys' fees when a valid ERISA delinquency claim is made and won. Here we have the successful prosecution of a claim for an ongoing deficiency. ERISA does not require that the attorney's endeavors be split into time spent in pursuit of the pre-1975 delinquency and time spent in pursuit of the post-1975 delinquency. To require such a division would be to require an impractical, if not an impossible task.

Of course, ERISA does not justify any award of attorneys' fees to the Union.

In that regard, however, the district court correctly relied on its equitable powers. In *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) the Supreme Court recognized that equity allows an award of attorneys' fees "when the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons. . . .' " [Citations omitted]. 421 U.S. at 258–59, 95 S.Ct. at 1622, 44 L.Ed.2d at 154. Consolidated argues that here the district court made no specific finding that Consolidated acted in "bad faith, vexatiously, wantonly, or for oppressive reasons."

Consolidated relies upon the words and not upon their meaning. While the court did not use the phrase "bad faith," its finding in that regard was clear. The court held that Consolidated refused to contribute to the funds as required by the agreement. It concluded that before 1977 the Union and Consolidated had been engaged "in a cat and mouse game" by which the Union "tried to enforce the written contract as best it could *in the face of Defendant* but was not always successful." [emphasis in original] 515 F.Supp. at 1184. It found that Consolidated had hobbled the plaintiffs' ef-

---

(ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
(E) such other legal or equitable relief as the court deems appropriate.
For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 23.
Section 1145, adopted in 1980, states:
**§ 1145. Delinquent contributions**
Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.
This suit was brought and tried before the advent of § 1145 and the amendment of

§ 1132(g), but was decided after that time. Since the action was not one to enforce § 1145, we presume that the court relied upon its discretionary authority rather than the mandate of the new § 1132(g)(2). In this case, where attorneys' fees were awarded and where there was no abuse of discretion, both subsections lead to the same result on the issue of the propriety of the attorneys' fees award.

**17.** 29 U.S.C. § 1144 provides, in pertinent part:
**Supersedure; effective date**
(a) Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975.
**Construction and application**
(b)(1) This section shall not apply with respect to any cause of action which arose, or any act or omission which occurred, before January 1, 1975.

forts to audit Consolidated's records by refusing to turn over certain reports and contracts. It found Consolidated to have committed fraudulent concealment by representing that its reports of contributions were full and complete. These conclusions meet the "bad faith" standard set forth in *Alyeska*. Consolidated alleges no abuse of discretion in this regard and we find none.

### III. *The Interest Issue*

■ The court assessed interest

[F]rom the date each delinquent monthly contribution came due, at the rate of 10 percent per annum, compounded annually for the audit period of February 20, 1971 through December 31, 1975, together with all costs of Court incurred, and with interest at the aforesaid rate, from the date of entry of this Judgment until satisfaction or execution thereof.

Consolidated objects to that figure, arguing that under 28 U.S.C. § 1961, before its amendment in 1982, interest should have been set in accordance with Texas law at 6% per annum for prejudgment and 9% per annum for postjudgment interest. We find no merit in this argument. The court's award was proper under F.R.Civ.P. 54(c) and the express terms of the trust fund instruments.[18]

We find no error on the part of the district court.

AFFIRMED.

---

18. The Pension Fund trust instrument provides, "... [A]n Employer in default for ten working days may be required at the discretion of the Trustees to pay such reasonable rate of interest as the Trustees may fix on the monies due to the Trustees from the date when the payment was due to the date when the payment is made...."

The 1975 amendment to the Agreement and Declaration of Health and Welfare Trust provides, in the case of delinquency, for "... liquidated damages in the amount of ten percent (10%) of the delinquent amount."