**UNION OF TRANSPORTATION EMPLOYEES, Plaintiff,**

v.

**OIL TRANSPORT COMPANY and Gypsum Transport, Inc., Defendants.**

**Civ. A. No. CA 3–83–0108–G.**

United States District Court,
N.D. Texas,
Dallas Division.

July 19, 1984.

Marvin Menaker, Dallas, Tex., for plaintiff.

Allen P. Schoolfield, Jr., Schoolfield & Smith, Dallas, Tex., for defendants.

## MEMORANDUM OPINION

FISH, District Judge.

### Factual Background

This is a dispute between two carriers engaged in transporting goods by truck (Oil Transport Company and Gypsum Transport, Inc.) and the union representing their drivers (Union of Transportation Employees).

In early 1978, the carriers and the union entered into collective bargaining agreements under which the drivers were to be paid as follows:

> drivers ... will be paid on a percentage of revenue on current freight rates received by the company and increases or decreases thereof. For purposes of revenue the following are not included: (1) extra stops, (b) demurrage, (c) C.O.D., (d) invoice charge. (These items are paid in other sections of this agreement.) *Fuel surcharge will be used in computation of pay.*[1]

---

1. This provision is Section 5.22 in the union's agreement with Oil Transport for the period

(Emphasis added). Until mid-1979 the carriers paid the drivers according to this formula and used the fuel surcharge in computing the drivers' pay.

The carriers are part of an industry regulated by state and federal agencies. The Texas Railroad Commission has regulatory power over the rates that carriers can charge shippers who use their services within the state. In 1979, the Commission received evidence from various carriers it regulates concerning their fuel costs for several preceding months.[2] On the basis of this evidence, the Commission found that, because fuel costs had increased significantly, the carriers should be allowed to increase the rates they charged the public. The Commission called the increase it allowed a "fuel adjustment charge."

In authorizing this "fuel adjustment charge," the Commission included the following restriction on its use:

> It is further ordered that the amount of increased revenues authorized herein are to accrue and be *paid* only to the purchaser of fuel, with no portion thereof to be expended for any other costs incurred by carriers in the transportation of shipments subject to rates and charges published in tariffs affected by this Motor Freight Circular.

(Emphasis added).

The carriers interpreted this restriction to prohibit use of the fuel surcharge in computing drivers' pay. Accordingly, they began to exclude that factor from the pay-computation formula.

In consequence, a driver for Oil Transport filed a grievance under the union's collective bargaining agreement with Oil Transport, alleging a violation of Section 5.22 of the agreement. Predictably, a driver for Gypsum filed a similar grievance

alleging that Gypsum was violating Section 5.17 of its collective bargaining agreement.

Although the collective bargaining agreements contain arbitration provisions, the carriers refused to arbitrate these grievances. The union filed a complaint in district court to compel arbitration. On cross-motions for summary judgment, the district court entered an order granting the carriers' motion for summary judgment and refusing to order arbitration of the grievances. The union appealed that order to the Fifth Circuit, which reversed and remanded the case with directions to order arbitration. *Union of Transportation Employees v. Oil Transport Company*, 668 F.2d 821 (5th Cir.1982).

The two grievances were submitted for arbitration on October 5, 1982. In a lengthy opinion dated November 22, 1982, the arbitrator ruled in favor of the union and made the following award:

> The fuel surcharge collected by the Companies should have been included in the computation of drivers' pay from May or June, 1979, whichever is applicable, when the Companies ceased using it, through January 14, 1981 for the drivers of Oil Transport Company and through March 1, 1981 for the drivers of Gypsum Transport, Inc. The Union and the Companies shall administratively determine the amount of pay to [sic] which the drivers of the respective Companies shall receive but in the event of their failure to agree, the Arbitration retains jurisdiction for that purpose only.

When the carriers refused to comply with this award, the union filed suit in this court seeking to enforce the award under 29 U.S.C. § 185(a). The case is ripe for decision here on cross-motions for summary judgment.

---

January 15, 1978 through January 14, 1981. Section 5.17 in the union's agreement with Gypsum for the period March 2, 1978 through March 1, 1981 is virtually identical.

**2.** For example, the Commission recited in its order of May 29, 1979 that it received evidence from the Texas Bulk Carriers, Inc. and the Texas Tank Truck Carriers Association, Inc. regard-

ing their fuel costs from September 1978 to April 1979. Similarly, the Commission's order of June 25, 1979 recited that the Commission received evidence from members of the Texas Bulk Carriers, Inc., to which Gypsum belongs, regarding its fuel charges from April 1979 to May 1979.

## Standard of Review

When a party seeks to enforce an arbitration award, the court's review of the award is extremely limited. Enforcement of an arbitration award may be denied only if:

(1) the dispute was not arguably arbitrable;

(2) the arbitral decision did not draw its essence from the collective bargaining agreement; or

(3) enforcement of the award by the court would violate public policy.

*Amalgamated Meat Cutters v. Great Western Food Co.*, 712 F.2d 122, 124 (5th Cir.1983).

It is now a well-established rule that arbitration is generally favored as a matter of federal labor policy. *Gateway Coal Co. v. United Mine Workers of America*, 414 U.S. 368, 377–79, 94 S.Ct. 629, 636–37, 38 L.Ed.2d 583 (1974); *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 566–68, 80 S.Ct. 1343, 1345–46, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior and Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *Amalgamated*, above, at 124; *Bugher v. Consolidated X-Ray Service Corp.*, 705 F.2d 1426, 1434 (5th Cir.1983).

A federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be the better one. When the parties include an arbitration clause in their collective bargaining agreement, they have chosen to have their disputes resolved by an arbitrator, not by a court. *W.R. Grace and Co. v. Local Union 759*, 461 U.S. 757, ___, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298 (1983).

Though the carriers put forth several arguments why the arbitrator's award should not be enforced, only three of those will be discussed.[3]

## Will Enforcement of the Arbitration Award Violate Public Policy?

The first two of the carrier's arguments center on the same issue: whether enforcement of the award would violate public policy. In the carriers' words,

a. *[e]nforcement of the award would violate and conflict with law.* (The award violates orders, rules and regulations of the Railroad Commission of Texas.)

\* \* \* \* \* \*

d: *The award conflicts with established public policy* (as declared, regulated and enforced by the Railroad Commission of Texas and the Interstate Commerce Commission of the United States).

(Emphasis in original).

As with any contract, a court may not enforce a collective bargaining agreement which is contrary to public policy. If the contract, as interpreted by the arbitrator, violates some explicit public policy, a court should not enforce it. Such a public policy, however, must be well defined and dominant, and it must be ascertained by reference to the laws and legal precedents, not from general considerations of supposed public interests. *W.R. Grace and Co.*, above, at 2183. A court should exercise extreme caution before declaring that an arbitral award violates public policy. *Amalgamated*, above, at 124.

The public policy on which the carriers rely finds expression in the Commission's orders of May 29, 1979 ("the May order") and June 25, 1979 ("the June order"), which have been described above. Those two orders require that the fuel adjustment

---

**3.** Additionally, the carriers argue that (1) the award was made in manifest disregard of the law, (2) the articulated basis for the award is in error, (3) the award cannot withstand the court-prescribed test of fundamental rationality, and (4) the determinations of regulatory governmental agencies supercede labor contracts and arbitration awards. Because these arguments fall outside the only grounds the Fifth Circuit has recognized for not enforcing an arbitration award, they need not be considered here. *See Amalgamated*, above, at 124.

444

charge be *paid* only to purchasers of fuel, *i.e.*, the carriers. By contrast, the collective bargaining agreements, as interpreted by the arbitrator, provide for use of the fuel surcharge only to *compute* drivers' pay. As literally written, then, there is no conflict between the Commission's May and June orders and the arbitrator's award.

Nevertheless, the carriers contend that a conflict exists between the arbitrator's award and the Commission's orders because the Commission so determined in a show cause order dated July 11, 1983 ("the July order"). According to the July order, Nim K. Graves, the Commission's Assistant Director—Enforcement, filed a motion on June 9, 1983 requesting an investigation, which alleged that "Respondents [the carriers] will be compelled to pay a portion of fuel adjustment charge revenues collected by them to union members, in violation of RCT orders, if ordered to by a court of competent jurisdiction."

The Commission held an investigatory hearing on June 20, 1983,[4] in which the carriers, but not the union, participated. Following the hearing and a conference, the Commission made its findings of fact and conclusions of law.

Only some of these findings are relevant here. The Commission first found that "UTE [the union] has filed a Motion for Summary Judgment in the lawsuit referenced in Finding No. 14 on June 2, 1983." Next, the Commission found that the carriers in this case and some unnamed carriers not before the court, as well as the enforcement staff of the Commission, have all construed the May and June orders to prohibit any payment to persons other than the carrier which are *based* on fuel adjustment charge revenues.[5] The Commission then outlined, under the heading "Discussion and Conclusions," the following explanation for the July order:

The meaning of the Commission's fuel adjustment charge orders is apparent on the face of the orders, as well as from the uniform construction given to such orders by respondents [the carriers], the industry, and the Commission's enforcement staff. Revenues from fuel adjustment charge orders are to "accrue and be paid only to the purchaser of fuel." *No payment to a person other than the purchaser of fuel may be based on fuel adjustment charge revenues.* No portion of fuel adjustment charge revenues received by a carrier may be "expended for any other costs incurred by carriers in transportation subject to" the orders. (Emphasis added).

Finally, the Commission concluded that the arbitrator's interpretation of the May and June orders was "clearly contrary to the *intent* of the Commission ..." (emphasis added) and that its "orders govern not only *payment* of fuel adjustment charge revenues, but also *accrual* and *expenditure* of such revenues" (emphasis in original).

■ As noted earlier, a court must use extreme caution before declaring that an arbitral award violates some public policy; it should do so only on the basis of a definite and dominant statement of public policy. When public policy is interposed as a bar to enforcement of an arbitration award, a court must independently evaluate its asserted content. *Local 453, International Union of Electrical, Radio & Machine Workers v. Otis Elevator Co.*, 314 F.2d 25, 29 (2d Cir.1963). *See also W.R. Grace*, above, 103 S.Ct. at 2183.

■ Before this court can determine the question of conflict between the award and public policy, it must first decide what weight should be given to the Commission's interpretation of the May and June orders, particularly the Commission's inter-

4. The July order recites that a Notice of Investigation and Hearing for the June 20, 1983 hearing was served on the Honorable Joseph McElroy, Jr., who was at the time District Clerk of the United States District Court for the Northern District of Texas.

5. Though the July order makes reference to a transcript of the proceedings, the transcript was not presented to the court as part of the summary judgment record.

pretation of the phrase "be paid only" in those orders. For two different reasons, this court has concluded that it cannot defer to the Commission's interpretation of the phrase "be paid only."

First, the carriers have not directed the court to any case arising on similar facts which would require deference to the Commission's interpretation. This is not a case where (1) an administrative agency, with jurisdiction over the parties, conducted a hearing with all interested parties participating and (2) the decision of the agency was then appealed directly to this court for review. In view of the unusual circumstances here, none of the principles mandating deference to an agency's decision would appear to be applicable.

Second, even if the circumstances here invoked the rule of deference, such deference is not required when there are compelling indications that the agency interpretation is wrong. *Banda v. Office of Personnel Management, Department of Air Force,* 727 F.2d 471, 473 (5th Cir.1984).

■ The Commission's ultimate conclusion that a conflict exists between the arbitration award and its May and June orders turns on its interpretation of the phrase "be paid only to the purchaser of fuel." From a reading of the July order as a whole, it is clear that the Commission must have construed the phrase "be paid only to the purchaser of fuel" to mean that "no payment to a person other than the purchaser of the fuel may be *based* on fuel adjustment revenues." [6] Unless the phrase is given such a meaning, the arbitrator's award does not conflict with the May and June orders.

The Commission's rationale for so interpreting the phrase is not entirely clear. Arguably, any other interpretation would result in the carriers not receiving all the compensation for increased fuel costs that the Commission intended them to have. The Commission's July order actually discusses, however, only the effect on the carriers if they *pay* fuel adjustment revenues to others; it does not consider what effect a payment *computed* on the fuel adjustment charge, but actually paid from other revenues, might have.

This distinction is reflected in the penultimate paragraph of the July order, where the Commission neither prohibits use of the fuel adjustment charge to *calculate* drivers' pay nor forbids payment from revenues other than fuel adjustment charge revenues (as directed by the arbitration award). Rather, the Commission's concern is focused exclusively on diversion of revenues generated by the fuel adjustment charge:

> The Commission concludes, therefore, that *accrual* of fuel adjustment charge revenues to drivers which did not purchase the fuel used, any *payment* of fuel adjustment charge revenues to drivers which did not purchase the fuel used, and any *expenditure* of such revenues for other than re-imbursement of fuel expense, is a violation of the Commission's fuel adjustment charge orders, and subjects respondents [the carriers] to the possibility that their certificates may be cancelled, suspended, or amended under V.A.C.S., Art. 911(b) [911b], § 12.

(Emphasis added).

Thus, while the July order does reflect a public policy against the *payment* of fuel adjustment charge revenues to noncarriers,[7] it cannot be characterized as a state-

**6.** The July order contains but a single sentence expressing the Commission's reasoning on this issue, and that sentence simply states a conclusion: "No payment to a person other than the purchaser of fuel may be based on fuel adjustment charge revenues." No explanation whatever is offered for the Commission's construction that the phrase "be paid only to the purchaser of the fuel" must of necessity prohibit payments based on fuel costs. Absent some statement of reasons for departing from the literal language of the May and June orders, this court cannot give any weight to the Commission's conclusion that a conflict exists between its May and June orders, on the one hand, and the arbitration award on the other.

**7.** The union has not challenged the express rationale of the Commission or the literal language of its orders. The arbitrator also recognizes, in both his findings and in his award, the

ment of public policy against mere use of the fuel adjustment charge in a pay formula. In short, the purported statement of public policy in this case is neither definite or dominant.

There are additional reasons why the court is not persuaded that the arbitrator's award violates public policy in this case. First, if the Commission's few conclusory assertions here were accepted as a statement of public policy sufficient to allow the carriers to avoid contractual obligations otherwise enforceable, the possibilities for abuse would be limitless, as indicated by the present record.

The record here reflects that (1) the Commission issued the May and June orders to benefit the carriers; (2) the Commission entered its July order to adjudicate a "possible violation" of the May and June orders, in part on the ground that the carriers had *never* paid drivers based on fuel adjustment charge revenues[8]; (3) the Commission's July order was not entered until the union had already moved for summary judgment in this case, even though the collective bargaining agreements had been in existence for over five years and the arbitrator's award was issued more than seven months earlier; (4) the carriers' response to the union's motion for summary judgment, though due on June 26, 1983 under this court's local rules, was not filed until August 17, 1983, after the Commission had issued the July order; and (5) the Commission's conclusory interpretation of its own May and June orders goes far beyond their literal language.

Under these circumstances, acceptance of the Commission's statement of public policy would be more than deference—it would be an abdication of the court's duty to enforce the arbitrator's award. *See W.R. Grace*, above, at 2186:

Enforcement of the Barrett award will not inappropriately affect this public policy. In this case, although the Company and the Commission agreed to nullify the collective bargaining agreement's seniority provisions, the conciliation process did not include the Union. Absent a judicial determination, the Commission, not to mention the Company, cannot alter the collective bargaining agreement without the Union's consent.... Permitting such a result would undermine the federal labor policy that parties to a collective bargaining agreement must have reasonable assurance that their contract will be honored.

Second, even if it might somehow be argued that enforcement of the award will frustrate the Commission's policy of securing to the carriers the full benefit of the fuel adjustment charge, the effect of such enforcement would appear to be *de minimis*.

Enforcement of the award affects only the private interests of the carriers, rather than any significant interest of the public at large. The strong federal policy in favor of the peaceful and speedy resolution of industrial disputes through binding arbitration far outweighs any possible adverse impact.[9] *See International Brotherhood of Teamsters v. Washington Employers, Inc.*, 557 F.2d 1345, 1350–51 (9th Cir.1977).

### Did the Arbitral Decision Draw Its Essence From the Collective Bargaining Agreements?

The remaining argument advanced by the carriers against enforcement of the arbitration award is that the "arbitrator exceeded his powers." While this argument, as phrased, does not fall exactly within any ground for not enforcing an arbitration award, *see* page 4 above, the substance might arguably fall within the third

validity of the Commission's position on these matters.

8. The parties in this case do not dispute that the carriers did base their drivers' pay on the fuel adjustment charge until the May and June orders.

9. The carriers have never suggested to the court any dollar amount or percentage of the fuel adjustment charge they will not receive if they pay the drivers, from revenues other than fuel adjustment charge, amounts calculated on the basis of the fuel adjustment charge.

ground, *i.e.*, that the arbitral decision did not draw its essence from the collective bargaining agreement.

■ The "draw its essence" test requires only that arbitrator's decision be based upon the provisions of the collective bargaining agreement. *Mason & Hanger v. Metal Trades Council of Amarillo,* 726 F.2d 166-67 (5th Cir.1984). This test is intended to reach only those cases where the arbitrator bases his decision on some ground other than the arbitration agreement.[10]

■ An arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award. *United Steelworkers of America v. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 597–98, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960).

The carriers do not argue that the arbitrator failed to consider the collective bargaining agreements in making his decision. Instead, they claim that he erred when he "went beyond interpreting the meaning of the contract and assumed the judicial role of passing upon the legal issue reserved to the courts." The legal issue supposedly usurped by the arbitrator is whether enforcement of the collective bargaining agreement would violate public policy.

■ This position is untenable. The arbitrator's consideration of whether the enforcement of the collective bargaining agreements would violate policies of the Commission was invited by the carriers.

Throughout the lengthy history of this dispute, the carriers have never denied that they are in violation of the collective bargaining agreements; rather, they have always argued, before arbitrator and judges alike, that they have a "defense" to the violation: that enforcement of the collective bargaining agreement would violate public policy.[11]

The carriers initiated the presentation of this "defense" and voluntarily submitted it to the arbitrator. The arbitrator addressed this defense only at the carriers' behest, but his discussion of the "defense" was not the *basis* of his decision that the carriers were in violation of the collective bargaining agreement. Had the carriers never presented this "defense" to the arbitrator, or had the arbitrator merely ignored the "defense" by not addressing it at all, there would be no question that the arbitrator made an award *based* on the collective bargaining agreement.

Before considering this "defense," the arbitrator did consider whether, by refusing to pay the drivers based on the fuel adjustment charge, the carriers violated the collective bargaining agreement.

Thus, leaving aside the legal question of whether the language of the negotiated agreement having an effect on the wages of drivers covered by the contracts is set aside and must give way to the orders and direction of quasi judicial agencies, the Arbitrator must interpret the provisions of the Contracts between the two Companies and the Union for the purpose of determining if the Companies violated their respective Labor Agreements by not including fuel surcharges in revenue when computing the pay of drivers.

■ On this limited issue, there was no dispute before the arbitrator, just as there

---

**10.** "In that case [*W.R. Grace,* above] we held that an arbitrator's award was properly considered not to be binding under a later arbitrator's award because it did not draw its essence from the collective agreement. The arbitrator in that case made no pretense of applying the collective contract at all. He did not even refer

to it or its provisions. Instead, he made his award, admittedly, solely on the basis of 'fairness'." *Mason & Hanger,* above, at 168.

**11.** This issue was even urged before the Fifth Circuit as a "defense" to arbitration. 688 F.2d at 822–23.

is none in this court, that the collective bargaining agreements required the carriers to pay the drivers according to a formula which included the fuel adjustment charge. Nor was there any dispute that the carriers were not complying with this portion of the collective bargaining agreements. As a result, even if the arbitrator said more than was necessary to dispose of the limited question before him, it would be erroneous to conclude that the arbitrator's award was not drawn from the essence of the collective bargaining agreements.

### Is The Union Entitled To Pre-Judgment Interest?

 The general federal rule is that in the absence of a statutory provision the award of pre-judgment interest is within the discretion of the court. *Oil, Chemical & Atomic Workers International Union, Local #4–447 v. American Cyanamid Company*, 546 F.2d 1144 (5th Cir.1977). The federal standard is one of fairness. *Huddleston v. Herman & MacLean*, 640 F.2d 534, 560 (5th Cir.1981), *affirmed in part, reversed in part*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), *on remand*, 705 F.2d 775 (5th Cir.1983).

For the reasons outlined above, the actions of the carriers in refusing to abide by the arbitrator's award were without justification. Furthermore, the dilatory tactics of the carriers throughout this dispute have deprived the drivers of monies due them for almost five years.

 Needless to say, the detriment to the individual drivers, and the benefit to the carriers, in failing to pay these funds have been substantial. Therefore, in the interest of fairness, the court is of the opinion that the union should receive pre-judgment interest on the monies due under the arbitrator's award from the date of the award until the date of judgment herein.

### Is the Union Entitled to Its Costs and Attorneys' Fees?

 Although Section 301 of the Labor Management Relations Act does not specifically provide for costs and attorneys' fees,

it is clear that when a challenge to an arbitration decision is without justification, these costs are recoverable. *International Association of Machinists v. Texas Steel Co.*, 538 F.2d 1116, 1121 (5th Cir. 1976).

 When determining whether a party's refusal to abide by an arbitration decision was without justification, it is not enough merely to conclude that because the challenge was unsuccessful it was "without justification." By a parity of reasoning, however, the mere assertion that the party's refusal to abide by the award concerned the arbitrator's power to make the award does not compel the conclusion that the party's position must have been justified. Rather, the court must look to the realities of the situation. *International Association of Machinists v. Texas Steel*, 639 F.2d 279, 283 (5th Cir.1981).

Here, several grounds asserted by the carriers to challenge the award are not even legally cognizable bases for not enforcing an arbitration award. *See* page 5, above. In this case, the two proper grounds asserted by the carriers as a challenge to the award were without justification. Other than the Commission's July order, which was not even in existence at the time that the carriers initially refused to abide by the arbitrator's award, the arbitrator's award was not in conflict with any public policy.

The Fifth Circuit's rationale for allowing costs and attorneys' fees in some cases is particularly applicable to the present case.

"We refuse to countenance frivolous and wasteful judicial challenges to conscientious and fair arbitration decisions." ... The federal labor policy favoring voluntary arbitration dictates that when a refusal to abide by an arbitration decision is without justification, and judicial enforcement is necessary, the court should award the party seeking enforcement reasonable costs and attorneys' fees incurred in that effort. This sanction is necessary lest federal labor policy be frustrated by judicial condonation of dila-

tory tactics that lead to wasteful and unnecessary litigation.

*International Association of Machinists v. Texas Steel*, above, 639 F.2d at 284.

██ Given the circumstances under which the carriers challenged the arbitration award, the court is persuaded that these challenges were without justification. Consequently, the union should recover its costs and attorneys' fees.

### Further Proceedings

Counsel for the parties are **ORDERED** to make all reasonable efforts to stipulate the amount of costs and reasonable attorneys' fees incurred by the union in the prosecution of this case since the arbitrator's award on November 22, 1982. Should counsel be unable to reach agreement on these amounts, each side should submit, within 30 days of the date of this order, affidavits in support of the amount it claims is reasonable. *See* Rule 43(e), Fed. R.Civ.P.

### Conclusion

For the reasons stated above, the union's motion for summary judgment is **GRANTED** and the carriers' cross-motion is **DENIED.**